COLUMBIA INTERNATIONAL CORPORATION, Respondent, v. KEMPLER and others, d/b/a KEPCO, Appellants.

*No. 177. Argued March 4, 1970.—Decided April 3, 1970.*
(Also reported in 175 N. W. 2d 465.)

554

556

For the appellants there were briefs by *Lorinczi & Weiss*, attorneys, and *Robert K. Steuer* of counsel, all of Milwaukee, and oral argument by *Mr. Steuer*.

For the respondent there was a brief by *Snyder, Fisher, Lee & Lilly* of Milwaukee, and oral argument by *Edward H. Snyder*.

WILKIE, J.   On this appeal three issues are presented:

1. Was the nature of the transaction between Columbia and Kramer such as to give Columbia an unperfected security interest in the machines in Kramer's possession?

2. Was this unperfected security interest in the machines subordinate to the receiver's interest in said machines?

3. Did Kepco, when it purchased the receiver's interest with actual knowledge of Columbia's unperfected security interest, thereby subordinate its interest to Columbia's unperfected security interest?

*Nature of Transaction Between Columbia and Kramer.*

The trial court, relying on the provisions of sec. 402.401 (1) and (2), Stats., was of the opinion that the transaction between Columbia and Kramer was a sale and the retention of title in the machines by Columbia, in effect, created a security interest.[1]

We do not think that the transaction between Columbia and Kramer was a sale. Kramer did not fit the definition of a buyer, nor Columbia that of a seller under the terms of the Uniform Commercial Code.[2] Neither

---

[1] 402.401 "(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (s. 402.501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this code. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of ch. 409, title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

"(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading: . . . ."

[2] Sec. 402.103 (1) (a), Stats., provides: " 'Buyer' means a person who buys or contracts to buy goods." and (d), " 'Seller' means a person who sells or contracts to sell goods."

does the transaction fit the definition of a sale under the Code.[3]

However, it does not follow that since there was no sale Columbia retained all incidents of ownership of the machines and not merely a security interest.

Columbia urges that Kramer was a custodial agent for Columbia in which circumstances the code provisions concerning security interests would not apply.

But the facts that Kramer had possession of the machines; had only limited authority from Columbia to sell to a third-party buyer at the fixed prices set forth on the invoices, plus tax, with title to pass to the third-party buyer upon payment in full to Columbia; was to receive 10 percent of the fixed invoice price as its commission for the sale, while not indicative of a sale transaction, are indicative of a true consignment,[4] and not of a mere custodial-agent relationship.

Admittedly, as one commentator has noted, there is often confusion surrounding the meaning of a consignment contract because of the misuse of terms used to describe and define it.[5] Historically, the consignment contract has been denominated as a "sale," regarded as "security," and treated as a "bailment" or "agency."

---

[3] Sec. 402.106 (1), Stats. "In this chapter unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (s. 402.401). A 'present sale' means a sale which is accomplished by the making of the contract."

[4] See General Electric Co. v. Pettingell Supply Co. (1964), 347 Mass. 631, 199 N. E. 2d 326, 2 UCC Rep. Serv. 184. See generally, Hawkland, Consignment Selling Under the Uniform Commercial Code, 67 Commercial Law Journal (1962), 146.

[5] Hawkland, Consignments Under the Uniform Commercial Code: Sales or Security? Uniform Commercial Code Co-Ordinator Annotated (Willier, ed. 1963), 395 (hereinafter referred to as Hawkland).

Hawkland concluded that the term "consignment sale" is a misnomer, since the efficacy of a consignment depends on a finding that no sale has been made.[6]

In *Ludvigh v. American Woolen Co.,*[7] the United States Supreme Court held that a true consignment results in an agency or bailment relationship between the consignor and consignee. Since absolute ownership of the goods is in the consignor, the consignee is said to have no interest which can be transferred to his creditors or trustee in bankruptcy. "The consignor's title, therefore, at once becomes the sword of reclamation and the shield against execution." [8]

However, regardless of how desirable this conceptualization of a consignment contract is from the point of view of the consignor, it violates the principle of apparent or ostensible ownership: People should be able to deal with a debtor upon the assumption that all property in his possession is unencumbered, unless the contrary is indicated by their own knowledge or by public records. An understanding of the basic difference between "security" and "price-fixing" consignments will serve to emphasize the ability of the consignee here to deal with purchasers from him or his creditors.

A security consignment involves the delivery of goods to a merchant who has been induced to accept them by an agreement from the consignor permitting their return in lieu of payment if they are not resold. The merchant pays for the goods when they are sold; if they are not sold, the merchant does not pay for the goods. The consignor takes a risk because he has given up the goods without receiving payment. In order to provide some security to the consignor, "title" of the goods is located in him, hence the rule subordinating the creditors of the consignee to the superior title of the consignor.[9]

---

[6] *Id.* at page 395.

[7] (1913), 231 U. S. 522, 34 Sup. Ct. 161, 58 L. Ed. 345.

[8] Hawkland, *supra,* footnote 5, at page 396.

[9] *Id.* at pages 397, 398.

But consignments are also used to effectuate retail price maintenance. In consignment theory the goods belong to the consignor even though they have been delivered to a dealer for resale purposes. Thus, the consignor can legally fix the price of his own goods in the hands of the dealer. This is generally referred to as a true consignment; the consignor insists that the consignee charge a certain price for the goods.

This distinction between price-fixing consignments and security consignments becomes important when determining the effect of the Code.

Sec. 402.326 (3), Stats., is the starting point for consideration. This section provides:

"(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be *on sale or return*. This subsection is applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum.' However, this subsection is not applicable if the person making delivery:

"(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

"(b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

"(c) Complies with the filing provisions of ch. 409 [Secured Transactions]." (Emphasis added.)

According to sec. 402.326 (2), Stats., "goods held on sale or return are subject to [the claims of the buyer's creditors] while in the buyer's possession."

It is clear that under these two sections, the consignee's creditors can reach the consigned goods unless

the consignor has taken one of the three enumerated protecting steps. This does not necessarily mean that all consignments have been transformed into secured transactions which are governed by ch. 409, Stats. Rather, the Code provides that the consignor must take one of the three enumerated steps to protect his interest against creditors. The fact that one of these steps involves · ch. 409 does not necessarily mean that ch. 409 is otherwise relevant.

Thus, either ch. 402 or ch. 409, Stats., governs any given consignment. The problem arises in attempting to determine which one does govern.

There are two provisions in ch. 409, Stats., which indicate that consignments intended as security, even if created pursuant to provisions of ch. 402 (Sales), are to be governed by ch. 409 if the goods have been delivered to the consignee. Sec. 409.102 (2), Stats., provides:

"(2) This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or *consignment intended as security*. . . ." (Emphasis added.)

Sec. 409.113, Stats.,[10] complements this provision. These two sections indicate that security interests, even if arising under ch. 402, are governed by ch. 409 if the

---

[10] "409.113 Security interests arising under chapter 402. A security interest arising solely under ch. 402 is subject to the provisions of this chapter except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods:

"(1) No security agreement is necessary to make the security interest enforceable; and

"(2) No filing is required to perfect the security interest; and

"(3) The rights of the secured party on default by the debtor are governed by ch. 402."

debtor is in lawful possession of the goods. The consignee invariably is in lawful possession of the goods, since a consignment contemplates putting the goods in the possession of the consignee. The consignment transaction is governed by ch. 409 when it can be classified as a security interest.[11]

Sec. 401.201 (37), Stats., illustrates this. Originally, this section provided that all consignments created "secured interests"[12] but this has now been changed. This section now provides:

"(37) 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (s. 402.401) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to ch. 409. The special property interest of a buyer of goods on identification of such goods to a contract for sale under s. 402.401 is not a 'security interest,' but a buyer may also acquire a 'security interest' by complying with ch. 409. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but *a consignment is in any event subject to the provisions on consignment sales* (s. 402.326). . . ." (Emphasis added.)

Thus it can be seen that "The net effect of these provisions is that consignments under the Code are to be regarded as security interests governed by [ch. 409], unless the parties have intended them not to be secured transactions, *in which case they are governed by [ch. 402]*." (Emphasis added.)[13]

The critical inquiry must be into the intention of the parties. It has been suggested that the easiest way to

[11] Hawkland, *supra,* footnote 5, at pages 400–403.
[12] *See In re McClain* (D. C. Pa. 1956), 1 UCC Rep. Serv. 349.
[13] Hawkland, *supra,* footnote 5, at page 403.

determine the intention of the parties is to concentrate on the *function* of the consignment.[14]

As indicated above, consignments are used in two ways: (1) As a security consignment where the goods go to the merchant who is unwilling to risk finding a market for the goods so the "title" remains in the consignor; and (2) as a price-fixing device. Number (1) is clearly a secured transaction with the reservation of title to goods acting as collateral. Number (2) is designed only to insure resale price maintenance and has nothing to do with security.[15]

Dean Hawkland has said:

". . . there are good reasons to think that the draftsmen of the Code planned to have their 'intention' test of consignments determined functionally. The legislative history of Section 1–201 (37) surely corroborates this. Initially, . . . the section transformed all consignments into security interests. This carried the matter too far, because the price-fixing consignment is patently not a security transaction and obviously would not fit easily, if at all, under some of the provisions of Article 9. Therefore, an amendment was necessary which would remove this kind of consignment from the definition of 'security interest' while leaving the security consignment within the scope of Article 9. This was accomplished by changing Section 1–201 (37) to provide that only where the 'consignment is intended as security' is it to be regarded as creating a security interest. The reason assigned by the draftsmen for this change was to 'make it clear that a true consignment or lease is not a secured transaction subject to all the filing, priority and enforcement provisions of Article 9.' Clarity would have been promoted if the draftsmen had used language other than 'true consignment,' but the context and the sense of the statement suggest that 'price-fixing consignment' was thereby intended. Such language is often employed in this way, and the price-fixing consignment is the only one which

[14] *Id. But see* Comment, 14 Catholic U. L. Rev. (1965), 89, 96.
[15] Hawkland, *supra*, footnote 5, at page 404.

logically should not be 'subject to all the filing, priority and enforcement provisions of Article 9.' " [16]

Applying the functional test of intention to the facts of the instant case, it appears that what was intended here was a true consignment. Columbia retained control over the price and used the transaction to set the price for its machines. The fact that the prospective sale did not have to be affirmed by Columbia, does not destroy the price-fixing nature of the consignment. Since the price had already been set there would be no reason to check it with Columbia. Kramer was authorized to sell the machines for a certain price and then receive 10 percent of the fixed price as its commission. Clearly, this is a true or price-fixing consignment and the parties did not intend a security interest to arise. Since third parties dealing with Kramer might be led to assume the machines belonged to Kramer Industries, the Code requires that these parties be informed of Columbia's interest by requiring Columbia to take one of the protective steps listed in sec. 402.326 (3), Stats. Columbia's failure to take any of these steps caused it to lose its superior interest. Columbia is required to take these steps by sec. 401.201 (37), which provides that a consignment not amounting to a "security interest" is nevertheless subject to the provisions of sec. 402.326. [17]

### Receiver's Position.

Under the above analysis, it follows that by virtue of sec. 402.326 (2), Stats., the claims of Kramer's creditors, here the receiver, become superior to Columbia's claim in the machines because, concededly, Columbia did not

---

[16] *Id.* at pages 404, 405.

[17] *See* 1 Bender's Uniform Commercial Code Service, *Secured Transactions Under U. C. C.,* p. 1104, sec. 10.05 (2).

take any of the enumerated steps in sec. 402.326 (3) to perfect its rights.

However, there still remains the question of Kepco's rights in the machines since Kepco bought the receiver's interest with actual knowledge of Columbia's arrangement with Kramer. Before considering Kepco's position under these circumstances, it is necessary to consider the position of the receiver.

If this consignment was not viewed as a true (price-fixing) one, but rather as a security consignment which creates a security interest, then the situation is governed completely by ch. 409, Stats. If the instant situation is a true consignment, ch. 409 is circuitously brought into play by the filing provision in sec. 402.326 (3). It is clear that the other two protective steps are unavailable to Columbia.

Admittedly here Columbia has not perfected its interest since it failed to file a financing statement.[18] However, this does not completely destroy Columbia's priority since under secs. 409.201 and 409.301, Stats., an unperfected security interest is valid, enforceable, and superior to the rights of general, nonlien creditors. But sec. 409.301 provides:

"(1) Except as otherwise provided in sub. (2), an unperfected security interest is subordinate to the rights of:

". . .

"(b) A person who becomes a lien creditor without knowledge of the security interest and before it is perfected;

". . .

"(3) A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for benefit of creditors from the time of assignment, and a trustee in

---

[18] *See* sec. 409.302, Stats.

bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment. Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without knowledge even though he personally has knowledge of the security interest."

Thus, in the instant situation, since there is no allegation that all of Kramer's creditors knew of Columbia's security interest, the receiver is a lien creditor without knowledge,[19] and thus his interest is superior to Columbia's.[20]

### Effect of Kepco's Knowledge.

The crucial question remaining for our consideration concerns what the effect is here of Kepco's knowledge of Columbia's interest on Kepco's position as buyer of interest of the receiver.

As previously indicated, the trial court was of the opinion that Kepco, as a subsequent purchaser of the assets of Kramer from the receiver, could not step into the receiver's shoes and claim an interest superior to Columbia's since Kepco knew of Columbia's claim when it purchased the assets of Kramer.

The trial court relied specifically on the case of *In re Dennis Mitchell Industries, Inc.,*[21] to reach this conclusion. In that case, the petitioner sold to the bankrupt party two machines pursuant to a conditional sales contract. The assignee of the bankrupt had sold the assets of the bankrupt to Armstrong who had knowledge of the unperfected security of the petitioner at the time of

---

[19] See *In re Federal Wholesale Meats & Frozen Foods* (1969), 43 Wis. 2d 21, 168 N. W. 2d 70.

[20] See also sec. 409.312, Stats.

[21] (D. C. Pa. 1968), 280 Fed. Supp. 433. *See generally,* Note, 67 Mich. L. Rev. (1969), 1421, for a criticism of this case and *Bloom v. Hilty* (1967), 427 Pa. 463, 234 Atl. 2d 860.

his purchase of the assets. The court allowed the petitioner to reclaim his machines, reasoning that even though the unperfected security interest was subordinate to the receiver's, the purchaser from the receiver with knowledge of the unperfected security interest stands subordinate to the unperfected security interest owner because a sale in a bankruptcy proceeding is a judicial sale, and in a judicial sale "a purchaser takes title free from liens or outstanding interests of which he was without actual or constructive notice." [22]

The district court was subsequently and recently reversed by the Third Circuit Court of Appeals.[23] The court of appeals reasoned that actual knowledge on the part of the purchaser was immaterial. It said:

". . . To allow the lien of an unperfected security interest, invalid as against the trustee, to be resurrected against a purchaser from the trustee will surely inhibit bidding by such prospective purchasers with resulting harm to the bankruptcy estate."

The recent case of *Cash Loan Co. v. Boser*,[24] also relied on by the trial court, is clearly distinguishable. In that case the rights of a purchaser were considered inferior where he had purchased from a chattel mortgagor with knowledge of a valid unfiled chattel mortgage. But there was no intervening receivership so that the seller was not a receiver.

For the reasons given, Kepco's interest is superior to Columbia's and it is unnecessary to reach the other affirmative defenses raised by Kepco.

*By the Court.*—Order and judgment reversed and cause remanded with directions to enter a summary judgment in favor of the defendants.

---

[22] *In re Dennis Mitchell Industries, Inc., supra,* footnote 21, at page 436.

[23] *In re Dennis Mitchell Industries, Inc.* (3d Cir. 1969), 419 Fed. 2d 349, 359.

[24] (1967), 34 Wis. 2d 410, 149 N. W. 2d 605.