**Winifred MANGER, Plaintiff
and Appellant,**

v.

**Steven DAVIS; James B. Medlin; Word
Making Productions, Ltd.; CD&M Com-
pany and Michael Allred, Defendants
and Respondents.**

**No. 16744.**

Supreme Court of Utah.

Oct. 15, 1980.

John W. Lowe of Lowe & Hurley, Salt Lake City, for plaintiff and appellant.

Earl Jay Peck of Nielsen, Henriod Gottfredson & Peck, Salt Lake City, for Word Making Prod.

Melvin E. Leslie of Dart & Stegall, Salt Lake City, for CD&M Co.

Steven R. McMurray of McMurray, McIntosh, Butler & Nielsen, Salt Lake City, for Davis.

MAUGHAN, Justice:

Plaintiff, alleging her ownership of a valuable diamond ring, initiated this action to recover possession from Word Making Productions, Ltd., hereinafter "W.M.P." Plaintiff's consignee, Steven Davis, authorized Jack Anderson and Michael Allred to pledge the ring to W.M.P. The trial court ruled plaintiff's ownership was subject to the perfected security interest of W.M.P. in the ring, securing sums advanced by the pledgee. The judgment of the trial court is reversed, and the cause is remanded to the trial court for disposition in accordance with this opinion. All statutory references are to Utah Code Annotated, 1953, as amended, unless otherwise indicated.

Plaintiff is an octogenerian and widow of an academy award recipient, movie star, Warner Baxter. In the 1930's he gave her a diamond ring containing an emerald cut diamond of approximately 9.72 carats with six baguettes totalling .967 of a carat. Plaintiff met Davis at a dinner party given by her niece, whose husband was a successful Hollywood producer and friend of Davis. Plaintiff was in need of funds and Davis, a recent graduate of a school of gemology, informed her he could find a buyer for the ring. She gave him possession and a writing, which stated:

"Dear Mr. Davis ·It would please me so much ·if you would sell my emerald cut diamond ring for me · at whatever percent you consider OK. It was nice meeting you and your charming wife. 4/18/76

Sincerely
Winifred Manger"

There was an explicit understanding between plaintiff and Davis that any offer to purchase was to be submitted to plaintiff for approval. Davis made a brief attempt to sell the ring in San Francisco, but the offer to purchase was unsatisfactory. Davis took the ring to Salt Lake City, where he assured plaintiff, through telephonic communication, that it was secured in a vault in a bank. From time to time he

informed plaintiff of prospective sales, but the transaction always failed.

Without plaintiff's knowledge or consent Davis embarked on a peculiar course of action. He testified that he did not apprise her of his actions because she was too old to understand. Davis had met two promoters named Jack Anderson and Michael Allred, who owned stock in a local company, CD&M. The promoters explained that if they effected certain mergers of CD&M with companies in Colorado and Texas, they would be able to borrow money to purchase the ring. Davis gave possession of the ring to Anderson, who without the knowledge or authority of Davis, took the ring to Zions Bank, represented it was his property and pledged it to secure a personal loan for $10,000. The promoters gave Davis some stock certificates they represented to be worth $200,000.00. He determined the stock was worthless and returned it on October 12, 1976.

Thereafter, Allred approached James B. Medlin, President of W.M.P., which is a close corporation, to seek further loans, offering a valuable ring as security. Allred was indebted to Medlin, who knew Allred had few assets, and Medlin was suspicious about the proffered security. Allred explained that Davis was the owner of the ring and had consented to the pledge. Subsequently, Anderson, Allred, and Davis met with Medlin to arrange the loan and pledge. At this time Medlin required Davis to execute an affidavit, which provided:

"Steve Davis, being first duly sworn on oath, deposes and says: As full payment for services rendered to the Estate of Winifred Manger, on or about August, 1975, I received the following described ring:

\* \* \* \* \* \*

"The ring has been appraised with a retail replacement value of approximately $140,000.00.

"I am a certified diamond appraiser and have been duly certified by the Gemological Institute of America. My appraised value was $165,000.00.

"I have entered into an agreement with Michael Allred and Jack Anderson to allow them to use my ring as collateral to raise money for their private ventures in exchange for securities which they have allowed me to use as collateral for my own private ventures.

"I understand that Jack Anderson and Michael Allred may be using the above-described ring as collateral to borrow money from Word Making Productions and/or James B. Medlin, and agree that said ring may be used as collateral for said loan in any manner in which Jack Anderson and Michael Allred see fit to use it.

"Dated this 18th day of October, 1976.
Steve Davis."

Medlin, who is also an attorney, did not inquire what type of services were rendered by Davis, who was a young man, to receive this substantial compensation. Neither was Medlin curious about verification of the existence of such an estate, which he was informed was in Los Angeles, nor the unorthodox manner of compensation for services. He testified he relied on the statements of Allred and Anderson that the father of Davis was a prominent business man to verify the ownership of the ring. Medlin was similarly disinterested as to the motive of Davis to exchange a valuable asset with the promoters, one of whom was a debtor of Medlin and without assets, to further his own business interests. Medlin further arranged an agreement to notify the bank holding the ring as security for Anderson's loan of his subsequent security interest and appointing the bank as escrow agent to hold possession as a means of perfecting Medlin's security interest.

Plaintiff's ring was thus pledged to W.M.P. by the promoters to secure a loan of $20,000. Allred paid $5,000 of this loan to Medlin to discharge his prior indebtedness. Subsequently, Allred, alone, received an additional advance of $10,000, which was also secured by the pledge.

The promoters defaulted on all the loans and Anderson died. W.M.P. paid the bank $10,625 to discharge the prior indebtedness

and took possession of the ring. The trial court ruled W.M.P. had a perfected security interest, securing payment of the following amounts: $10,625, plus interest; $20,450, plus interest; and $10,000, plus interest and court costs.

Since the other defendants do not claim any interest in the ring, only plaintiff and W.M.P. are involved in this appeal.

The trial court found the ring was delivered to Davis on a consignment to sell in April, 1976, and plaintiff did not file a financing statement or take any other action designed to perfect a security interest in the collateral. There was a finding that plaintiff had no knowledge of any of the transactions except for the delivery to Davis for purpose of sale. Davis was found not to be a merchant dealing in diamond rings or goods of that kind, and there was no valid or effective sale of the ring ever made to CD&M Co.

In its conclusions of law, the trial court ruled that W.M.P., as a lender and pledgee, was a purchaser of the ring as defined in 70A–1–201(32). The court further ruled that pursuant to the following provisions of the Uniform Commercial Code in Title 70A: 2–104(1), 2–403(2), 1–201(19), 2–401, 2 403(1), 2–403(3), 2–403(4), 9–102, 9–105, 9–112, 9–113, 9–302, 9–501, W.M.P. had a perfected security interest in the ring by possession, which was prior to plaintiff's ownership interest. The lien of W.M.P. was obtained prior to any attempt by plaintiff to withdraw or rescind the authority of her agent, Davis. As a purchaser, W.M.P.'s lien rights applied to and secured payment of the loans. W.M.P. made the loans and took its lien in good faith without any knowledge of any claim of plaintiff. Davis was not a merchant dealing in diamond rings or goods of that kind as defined by the U.C.C. The trial court finally concluded that no valid or effective sale of the ring was ever made to CD&M and CD&M Company acquired no interest therein.

The essence of the dispute between the parties involves whether Davis, the consignee, had a voidable title. Respondent persuaded the trial court that Davis had such a title and a provision in Section 70A–2–403(1) was controlling, namely, "... A person with voidable title has power to transfer a good title to a good faith purchaser for value...." Since "purchase" includes taking by pledge, Section 70A–1–201(32), the trial court found the loan transaction, secured by a pledge of the ring to W.M.P., to be a good faith purchase for value.

In an analysis of this rather complex case, the appropriate point to begin is Section 70A 9 204(1), which provides that a security interest cannot attach until the debtor has rights in the collateral. Unless Davis had rights in the ring, so he could authorize the pledge by Allred and Anderson, the security interest of W.M.P. could not attach.

■ The Code does not clearly establish the meaning of "rights in the collateral." Although a debtor has possession of the collateral, that fact does not give him rights. If a security transaction relates to a sale, Article 2 may determine whether the debtor has rights.[1] If there be no authority to subject property to a security interest, the creditor has no security interest therein.[2]

■ Concededly, under Section 70A–9–305, a security interest in goods may be perfected by the secured party's taking possession of the collateral. Further, if the collateral, as herein, is held by a bailee, the secured party is deemed to have possession from the time the bailee (Zions Bank) received notification of the secured party's [W.M.P.] interest. However, Article 9 does not govern the creation of property rights, which may have arisen as a result of a sale of goods or under general principles of law which are not displaced by particular provisions of the Code (70A 1 103).[3]

---

1. 4 Anderson, Uniform Commercial Code (2nd ed.), Sec. 9–204:7, pp. 179–180.

2. Id., Sec. 9 204:8, p. 180.

3. Id., Sec. 9 305:3, p. 290.

The trial court found the transaction to be a consignment to sell between plaintiff and Davis. There is a degree of confusion in the findings and conclusions of law of the trial court in regard to this relationship. On the one hand, the term "consignment" connotes an agency relationship and not a sale, and the court refers to Davis as an agent. On the other hand, the court found plaintiff had not filed a financing statement or taken any other action designed to perfect a security interest in the collateral. The court cited Section 70A-2-401, which would indicate a sale, viz., plaintiff was a seller and Davis was a buyer, and upon delivery of the ring to Davis, any retention or reservation of title by plaintiff would be limited in effect to a reservation of a security interest, Section 70A-2-401(1). Such a transaction has been denominated as a consignment for security.

In regard to the application of the Code concerning consignments, there are three distinct consequences depending on the nature of the transaction. First, if a transaction is deemed a consignment *intended* as a security, it is a secured transaction and Chapter 9 applies, Section 70A-9-102(2).

However, under 70A-1-201(37) unless a consignment is intended as security, reservation of title thereunder is not a security interest, but a consignment is in any event subject to the provisions on consignment sales in Section 70A-2-326. A security consignment has the incidents of a sale, viz., the property is delivered to the consignee, who sells it at prices fixed by him and retains the proceeds; his only obligation is to pay the consignor when the property is sold. The consignor has agreed that if the goods are not resold, they may be returned in lieu of payment.[4] If the con-

signment is intended as security, it is governed by Article 9, since that article governs any transaction, regardless of its form, unless otherwise excluded, intended to create a security interest in personal property or fixtures, Section 9-102(1).[5]

Second, if a transaction be a true consignment, the Code may or may not control the transaction, depending on the status of the consignee as set forth in 70A-2-326(1), (2), (3). A true consignment constitutes an agency or bailment relationship between the consignor and consignee. The consignor, as principal retains the ownership, may recall the goods, and sets the sale price. The consignee (agent) receives a commission and not the profits of the sale. Since the absolute ownership of the property is in the consignor, absent a basis to apply an estoppel (including apparent or ostensible ownership), the consignee has no interest that can be transferred to his creditors or trustee in bankruptcy.[6] Section 70A-2-326 has modified the consequences concerning a true consignment:

"where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return...." (Subsection 3)

Under Section 70A-2-326(2) goods held on sale or return are subject to the consignee's creditors, while in his possession. A consignor must take one of the three enumerated steps in 70-2-326(3)(a), (b), (c) to protect his interest against the creditors of the consignee.[7] By means of Section 2-326, the Code sought to eliminate the danger extant under pre-Code consignment transactions that credit would be extended to a dealer on the basis of ostensible ownership of in-

**4.** *Columbia International Corporation v. Kempler*, 46 Wis.2d 550, 175 N.W.2d 465, 40 A.L.R.3d 1066 (1970); *District of Columbia v. Powers Gallery, Inc.*, D.C.App., 335 A.2d 244 (1975).

**5.** 40 A.L.R.3d 1078, Anno.: Consignment Transactions Under The Uniform Commercial Code, Sec. 3(a), p. 1087.

**6.** See authorities cited in footnote 4.

**7.** It should be noted that Sec. 70A-9-114, was enacted in 1977, to provide for the requisite filing set forth in Sec. 70A-2-326(3)(c).

ventory, which was, in fact, protected from the claims of his creditors.[8]

■ Third, if a transaction be a true consignment and does not fall within the purview of Section 70A–2–326, it is governed by the principles of agency, since it is not displaced by any particular provision of the act, Section 70A–1–103.[9]

■ The undisputed evidence in this case establishes that the transaction between plaintiff and Davis was a true consignment, establishing a principal–agent relationship. Davis was given possession with authority to sell only upon the express consent of plaintiff as to the sale price. Davis was to receive a commission and not a profit on the sale. Such a transaction does not fall within the purview of Section 70A–2 401, a provision cited by the trial court, for it was not a sale with title passing to the buyer. Further, Davis did not have the status of a buyer as that term is defined in 70A–2 103(1)(a):

" 'Buyer' means a person who buys or contracts to buy goods."

In 2 Anderson, Uniform Commercial Code (2nd ed.), Section 2–401:10, p. 11, it is explained:

"The authority of an agent to transfer title is distinct from the transfer of title which is the sale. Ordinarily the agent to sell, being clothed with no more than authority to make a transfer, does not hold title to the goods. . . . "

To sustain its ruling, the trial court further cited the provisions in Section 70A 2 403. These provisions are of no aid to W.M.P. because Davis had no title as a consignee. The basic pre–Code concept that a possessor cannot pass title was not altered by the Code, in the absence of circumstances bringing the case within the scope of Section 2–403. Thus, if the possession of the seller or pledgor (Davis) is that of a bailee (consignee), the loss must fall on him whose act made the loss possible so as not to benefit the pledgee or vendee, for the latter stands in no better position than a person who innocently buys, leases, or acquires property that had been stolen.[10] The provisions in Section 70A–2–403(1) are not applicable, since there was no transaction of purchase between plaintiff and Davis, wherein he could acquire voidable title.[11] The provisions in subsections (2) and (3) are inapplicable since the trial court expressly found that Davis was not a merchant.[12]

■ It should be asserted parenthetically that even though the entrustment provision of 2 403 is not applicable because the entrustee is not a merchant dealing in goods of that kind, the good faith purchaser may acquire a good title under principles of estoppel. However, it is necessary to show conduct of the true owner going beyond merely entrusting the entrustee with possession of the goods transferred by the entrustee to the good faith purchaser, for the mere delivery of possession of goods to another does not give rise to an estoppel against the true owner which prevents him from asserting title as against the possessor's good faith transferee.[13] In the instant case, W.M.P. did not plead an estoppel as required under Rule 8(c), U.R.C.P., and such a defense was therefore waived under Rule 12(h), U.R.C.P. Furthermore, there is no evidence in the record to sustain such a defense.

---

8. 40 A.L.R.3d 1078, Sec. 3(b), p. 1089.

9. 2 Anderson, Uniform Commercial Code (2nd ed.), Sec. 2–326:4, p. 777.

10. 2 Anderson, Uniform Commercial Code (2nd ed.), Sec. 2–403:6, p. 41.

11. See McDonald's Chevrolet, Inc. v. Johnson, 24 U.C.C.Rept.Serv. 331 (1978), Disch v. Raven Transfer & Storage Co., 17 Wash.App. 73, 561 P.2d 1097 (1977).

12. 2 Anderson, Uniform Commercial Code (2nd ed.), Sec. 2–403:22, p. 50, states: "The entrustment provision describes the entrustee merely

as a merchant 'who deals in goods of that kind.' . . . it would appear relevant in establishing the good faith of the purchaser from the entrustee that the purchaser had reason to believe that he was purchasing from a regular seller rather than a casual person who might or might not be the owner or authorized agent. There is authority that in order for UCC, Sec. 2–403 to apply, it is necessary that the merchant status of the entrustee be known to both the entruster and the purchaser."

13. Id., Sec. 2 403:18, p. 48.

W.M.P. has anticipated the problem of applying either Sections 70A-2 403 or 2 401 to the circumstances of this transaction; therefore, it has urged in its brief that the trial court erred in its finding that Davis was not a merchant dealing in diamond rings or goods of that kind, and thus the consignment would fall within the provisions of 70A–2–326(3). Without detailing the record, a survey thereof clearly sustains the finding of the trial court that in his participation in this transaction, Davis was not a person who maintained a place of business at which he dealt in goods of the kind involved. It is even more apparent that this provision is inapplicable when its purpose is reviewed, viz., to prevent credit from being extended to a dealer on the basis of his ostensible ownership of inventory, which was protected from the claims of creditors.[14] The representations of Davis in the affidavit he gave to W.M.P. indicate he was the owner of the ring, which was acquired for unknown services. There was nothing to indicate the trade or business of Davis and that he was conducting business from a definite location where he dealt in diamonds, and that the ring pledged was from this stock.

At this juncture, it is apparent that the transaction between plaintiff and Davis was a true consignment, and the law of agency resolves the conflicting claims between plaintiff and W.M.P. Restatement, Agency (2d), Section 201, provides:

"(1) Apart from statute and except as stated in Subsection (3), the interests of an undisclosed principal who entrusts an agent with a chattel other than a commercial document representing a chattel or chose in action with directions to deal with it in a particular way, as by sale, barter, pledge or mortgage is not thereby affected by a transaction of a kind different from that authorized.

"(2) The interests of the principal are affected by an unauthorized transaction of the same kind as that authorized if it is conducted in the usual and ordinary course of business by an agent with one who reasonably believes the agent to be the owner and who pays value.

"(3) If the principal delivers a chattel to a dealer in such chattels to be sold or exhibited for sale, an unauthorized sale of the chattel by such dealer in accordance with the normal business practices to one who reasonably believes the dealer to be the owner, binds the owner, although the dealer was not authorized to sell it without the consent of the owner or was not authorized to sell it to the person to whom it was sold or at the price at which it was sold."

Comment (a), following Section 201, refers to the Comments on Section 175. Comment (e), following Section 175, states:

"What transactions are considered to be of a kind different from those authorized is a matter of degree. For the purpose of this Section, authority to barter does not give power to the agent to pledge or to mortgage the property. . . . "

The authority conferred on Davis by plaintiff to sell the ring did not give him the right or power to pledge it in his own interest as an incident to his express authority. The pledge to W.M.P. was a transaction of a different kind than that authorized by plaintiff and therefore her interest in the ring was not affected thereby.[15] Since Davis had no authority to pledge the ring, the pledgee, W.M.P., did not acquire a valid security interest therein, and plaintiff is entitled to recover unencumbered possession thereof.

Costs are awarded to plaintiff.

WILKINS and STEWART, JJ., concur.

HALL, J. concurs in the result.

CROCKETT, Chief Justice (concurring in the result):

I concur in the result of allowing the plaintiff to recover her ring. But because I

14. See note 8, supra.

15. Restatement, Agency, 2d, Sec. 201(1); *Beeson v. Hegstad*, 199 Or. 325, 261 P.2d 381, 49 A.L.R.2d 1266 (1953); 49 A.L.R.2d 1271, Anno.: Salesman's power to pledge employer's or principal's personal property, Sec. 2[a], pp. 1272–1275.

am somewhat unsure of some of the matters recited in the main opinion, including the effect of provisions of the Uniform Commercial Code, I desire to state as succinctly as possible the reasons which persuade me to support this Court's decision.

First, I acknowledge the soundness of the proposition that, generally, where a loss must be borne by one of two innocent parties, it should fall upon the one who made the loss possible; and that this would suggest that it be borne by plaintiff, Mrs. Manger, who delivered the ring into the possession of Mr. Davis. But like all general rules, its purpose is to serve the interests of justice, rather than to defeat them; and accordingly, it is subject to exceptions in circumstances where defeating justice would be the result.

The special circumstances that persuade me to support this Court's decision are these:

First, the ring in question was not any ordinary item of personal property or merchandise. It was something so extraordinary in composition and value that it is properly regarded as unique.

Second, Mr. Davis was but a consignee who had no right to sell or to pledge the ring, but only to obtain a prospective purchaser.

Third, he was not regularly engaged in that business.

Because of the foregoing, the exercise of ordinary care and prudence would require that anyone dealing with such a ring should act with commensurate caution. If the defendants had adhered to that standard, they would have discovered the facts. Accordingly, they are not in a position to assert estoppel against the plaintiff. It is for these reasons that I agree that she should be entitled to recover possession of her ring.