In re Sanders J. RUSSELL, Nellie G. Russell, Debtors.

Sanders J. Russell, Nellie G. Russell and William E. Callahan, Trustee, Plaintiffs,

v.

Mountain National Bank, et al., Defendants.

Bankruptcy No. 7–97–03333–WSA–7. Adversary No. 7–97–00283.

United States Bankruptcy Court, W.D. Virginia, Roanoke Division.

June 28, 2000.

John M. Lamie, Browning, Lamie & Sharp, P.C., Abingdon, VA, for Sanders J. & Nellie G. Russell.

Howard J. Beck, Jr., Gentry, Locke, Rakes & Moore, Roanoke, VA, John L. Gregory, III, Young, Haskins, Mann, Gregory & Smith, Martinsville, VA, for Mountain National Bank.

William E. Callahan, Jr., King, Higgs & Callahan, Roanoke, VA, Trustee for Debtor.

### SUPPLEMENTAL MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

This Opinion supplements the Court's Memorandum Opinion dated February 1, 2000 and should be read together with it. The Chapter 7 Trustee, William E. Callahan, has been added as a party to this adversary proceeding and he has filed a Memorandum asserting a right superior to all parties in all of the purported consignors' furniture other than that of Morris Vaughn Furniture Company, the only consignor to file a financing statement.

The issues remaining for decision are as follows:

3. Whether the wording of the bank's security agreement and financing statements was sufficient to create a security interest in the furniture owned or financed by the consignors?

4. Whether the action of one of the consignors, Maurice Vaughn Furniture Company, in filing a financing statement for its furniture was sufficient to protect its rights against the bank even if the other consignors lose theirs?

5. Whether actual knowledge by responsible bank officials of the consignment arrangements made by the debtors with the consignors and its acquiescence in those arrangements precludes the bank from enforcing its security interest against the furniture financed or owned by the consignors if the latter failed to take all steps ordinarily necessary under applicable Virginia statutes to protect their rights?

The Court will address these issues in reverse order.

**5. Whether actual knowledge by responsible bank officials of the consignment arrangements made by the debtors with the consignors and its acquiescence in those arrangements precludes the bank from enforcing its security interest against the furniture financed or owned by the consignors if the latter failed to take all steps ordinarily necessary under applicable Virginia statutes to protect their rights?**

 There is a fairly significant body of case law which has grappled with the issue of under what circumstances, if any, the courts ought to permit exceptions to the security interest priority rules of the Uniform Commercial Code when a strict enforcement of same would produce a seemingly inequitable or unjust result. *See* Annot., Equitable Estoppel of Secured Party's Right to Assert Prior, Perfected Security Interest Against Other Secured Creditor or Subsequent Purchaser Under Article 9 of Uniform Commercial Code (Conder, Joseph B.), 9 A.L.R.5th 708 (1993). *Compare, In the Matter of High–Line Aviation, Inc.,* 149 B.R. 730 (Bankr. N.D.Ga.1992) and *Columbia International Corporation v. Kempler,* 46 Wis.2d 550, 175 N.W.2d 465, 40 A.L.R.3d 1066 (1970)

with, *In re Marcoly,* 32 B.R. 423 (Bankr. W.D.Pa.1983), *Nolin Production Credit Assoc. v. Canmer Deposit Bank,* 2 UCC Rep. Serv.2d 636, 726 S.W.2d 693 (Ky.Ct. App.1986) and *Ninth Dist. Production Credit Assoc. v. Ed Duggan, Inc.,* 16 UCC Rep. Serv.2d 853, 27 A.L.R.5th 921, 821 P.2d 788 (Colo.1991). *See also* 68A Am. Jr.2d, Secured Transactions § 788 (1993).

As to the controversy before this Court, Virginia provides the applicable law for decision because the Debtors' place of business where the consigned furniture was placed was in Carroll County, Virginia. Va.Code § 8.9–103(2)(Repl.Vol.1991). Accordingly, the rights of the parties and their relative priorities are determined by Virginia law. Of course, however, the Trustee's claims derive from the status accorded him by section 544 of the Bankruptcy Code. To determine the effect under Virginia law of the bank's knowledge of and acquiescence in the consignment arrangements between the Russells (the Debtors) and the consignors, the Court has been guided by the Supreme Court of Virginia's opinion in the case of *Grossmann v. Saunders,* 237 Va. 113, 376 S.E.2d 66, 8 UCC Rep Serv 2d 214. 237 Va. 113, 376 S.E.2d 66 (1989), which dealt with competing claims in certain "instruments". The Court stated:

> Generally, whether a secured party had actual notice of a prior security interest is not a relevant consideration in determining priorities. Code § 8.9–312(5) contains no provision establishing lack of notice as a prerequisite for its operation.
>
> . . . .
>
> Although lack of notice is not a prerequisite to operation of Code § 8.9–312(5), Code § 8.1–203 provides that "[e]very contract or duty with this act imposes an obligation of good faith in its performance or enforcement." Accordingly, allegations and proof of "a leading on, bad faith or inequitable conduct" on the part of a secured party may affect the priorities established under Code § 8.9–

312(5) by estopping the assertion of a priority. [citations omitted]

237 Va. at 124–25, 376 S.E.2d at 72. While this decision did not deal with the rights of consignors versus the rights of consignees' secured creditors, it is apparent that Va. Code § 9–114 (Repl.Vol.1991) essentially accords the same treatment to consignors as it does to purchase money secured parties vis-a-vis prior perfected security interests. Accordingly, the Court concludes that the *Grossmann* decision would be applied by the Supreme Court in Virginia in applying § 8.9–114 to resolve a priority dispute between a consignor and its consignee's prior perfected secured party against property of the same kind. This Court has made a finding of fact that while the bank was aware of the consignment arrangements in general, it did not engage in any affirmative conduct to promote those arrangements or lull the consignors to fail to perfect themselves. While there was some slight evidence suggesting that one of the bank's officials encouraged Mr. Russell to pursue the consignment arrangements, the decided weight of the evidence was that it simply acquiesced in them and took no real action either to encourage or discourage them. Certainly there was no evidence introduced that the bank made any representations to or even had any contact at all with any of the consignors; similarly, there was no evidence that any of the consignors relied in any way on anything done or not done by the bank in deciding what to do to protect his, her or its interests. Accordingly, whatever the bank's rights are against the disputed furniture inventory, the Court finds that its knowledge of the consignment arrangements does not preclude it from asserting such rights against the consignors.

**4. Whether the action of one of the consignors, Maurice Vaughn Furniture Company, in filing a financing statement for its furniture was sufficient to protect its rights against the bank even if the other consignors lose theirs?**

In the absence of evidence that Triangle Discount Furniture was generally known by its creditors to be selling furniture on consignment, a consignor of furniture to such business was bound under Virginia law not only to file financing statements at the local Clerk's Office and the State Corporation Commission, but also to give specific written notice of its status and actions to the holder of any prior secured creditor whose filed financing statements would affect the consignee's inventory. Va.Code § 8.2–326(c) and § 8.9–114 (Repl.Vol.1991). There having been no evidence introduced that Morris Vaughn Furniture Company gave any notice to the bank of its consignments to the Russells, its rights would be subordinate to the bank's security interest if the latter's security interest attached to the consignor's furniture.

**3. Whether the wording of the bank's security agreement and financing statements was sufficient to create a security interest in the furniture owned or financed by the consignors?**

What seemingly would be the easiest issue to resolve has proved the most troublesome to the Court. Certainly at the time the security interest to the bank was granted and perfected, the parties had no contemplation of any consigned furniture being a part of the Russells' inventory. All of their then inventory was clearly owned by them and both parties intended to create a security interest in the bank's favor against such inventory. Neither the security agreement nor the financing statements, understandably, made any reference to consigned goods. As previously noted, both the security agreement and the financing statements stated the collateral subject to the bank's security interest to cover:

all the *debtors'* . . . inventory, . . . furniture and fixtures, . . . *whether now owned or hereafter acquired* or the proceeds thereof, associated with the property [description omitted] and in the

business known as Triangle Discount Furniture and *owned* and operated by Sanders J. Russell and Nellie C. Russell [emphasis added].

The Security Agreement further provided that the Debtors granted to the bank "a security interest in all rights to which the *owner* of the collateral is now or may hereafter become entitled by virtue of *owing* such collateral...." [emphasis added] Further, the Debtors represented and warranted "with respect to each part of the Collateral" that they had "good and marketable title to it" and that it was not subject to any "claim, lien ... or security interest of any other person." Lastly, as relevant to this discussion, such agreement provided that it would be construed according to Virginia law and the rights provided to the bank under the agreement were "in addition to all rights, powers and remedies given to the Secured Party by virtue of any statute or rule of law."

If, therefore, the security interest had been granted after the consignment arrangements had been made, with the bank having the same knowledge about such arrangements which the Court has found that it gained later, the Court would have to conclude that the intent of the parties as evidenced by the wording they chose to incorporate in their agreement was to limit the security interest to that inventory actually owned by the Russells. The rub is in attempting to apply the agreement's wording to a situation contemplated by neither party when the agreement was made. Whatever the bank's later frame of mind may have been, it is abundantly clear both from Mr. Russell's testimony and the wording of the consignment agreements that he considered the consigned furniture to be owned by the consignors and protected from the bank's claim against the inventory which he owned. Indeed, it appears that he was incensed by the bank's laying claim to furniture which belonged, in his view, not to the Russells but to other consignors.

■ There is definitely a tension between enforcing the actual understanding of the parties as delineated in the language utilized in their agreement and the goal of the Uniform Commercial Code as enacted in Virginia to bring uniformity of result in addressing conflicting claims upon the same property. Va.Code § 8.9–114 (Repl. Vol.1991) provides in relevant part as follows:

(1) A person who delivers goods under a contract consignment which is not a security interest and who would be required to file under this title by paragraph (3)(c) of § 8.2–326 has priority over a secured party who is or becomes a creditor of the consignee and *who would have a perfected security interest in the goods if they were the property of the consignee ... if*

(a) the consignor complies with the filing provision of the title on sales with respect to consignments (paragraph 3(c) of § 8.2–326) before the consignee receives possession of the goods; and

(b) the consignor gives notification in writing to the holder of the security interest if the holder has filed a financing statement covering the same types of goods before the date of the filing made by the consignor; and

(c) the holder of the security interest receives the notification within five years before the consignee receives possession of the goods; and

(d) the notification states that the consignor expects to deliver goods on consignment to the consignee, describing the goods by item or type.

(2) In the case of a consignment which is not a security interest and in which the requirements of the preceding section have not been met, a person who delivers goods to another *is subordinate to a person who would have a perfected security interest in the goods if they were the property of the debtor.* [emphasis added]

However, this statutory provision is subject to the overarching general principle of the Uniform Commercial Code that "[t]he effect of provisions of this act may be varied by agreement". Va.Code § 8.1–102(3)(Repl.Vol.1991). It is clear, therefore, that notwithstanding the above quoted language in § 8.9–114 which would mandate the same result of priority for consigned goods as "if they were the property of the consignee" as would be the case for goods owned and acquired by the debtor by virtue of credit provided by a supplier or purchase money financier, the consignors would nevertheless prevail if the Bank's security agreement had expressly excluded consigned or non-owned furniture inventory from its reach. Under Va.Code § 8.9–201, unless "otherwise provided by this act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." Here the agreement did not expressly exclude consigned goods, but the consistency of its language embracing the concept of title and ownership, a concept which the Commercial Code generally attempts to negate,[1] raises a substantial issue as to whether the security interest created by such agreement was broad enough in its scope to encompass furniture owned by others but physically made a part of the store's inventory. To be more specific, instead of the agreement covering "all inventory", it covered "all debtors' ... inventory". Are these terms in fact one and the same? Standing alone they certainly would be very close to the same. Instead of covering inventory "now existing or hereafter acquired or located on the premises", the agreement referred to inventory "now owned or hereafter acquired". Again, should different legal consequences attach to wording which is quite similar in meaning but not identical? In the agreement the debtors warranted that they owned each part of the collateral and that none of it was subject to any other claim. To what extent should this be taken as indicating the parties' intent that they only intended to create a security interest in property actually owned by the Debtors rather than extending to any rights which they had the power to grant to a lender by reason of being in possession of property with the power to sell it? In fact all of the language in the security agreement seems consistent in referring to property "owned" by the Russells as being the Bank's collateral.

Va.Code § 8.9–114 (Repl.Vol.1991)[UCC § 9–114] was enacted in 1973. Its intent was clearly to require the same steps, that is, filing of financing statements and written notification of existing secured parties, of a consignor of inventory as it would of a regular trade supplier of inventory to the same business to be entitled to prevail against a prior perfected security interest in the inventory of such business. The only exception[2] was where the business "is generally known by his creditors to be substantially engaged in selling the goods of others." Va.Code § 8.2–326(3)(b)(Repl.Vol.1991). One might logically ask why under this statutory scheme a prior perfected secured party who knows of and acquiesces in the interests of consignor suppliers to its customer, the creditors of which generally are unaware that the customer sells the goods of others, prevails against the consignors, while a prior perfected secured party without knowledge, but whose customer's creditors generally are aware that the business sells the goods of others, loses to the consignors. The answer appears to be that is the policy choice which has been made to obtain greater certainty and consistency in commercial transactions. In such situations the statute expressly subordinates the rights of the consignor to those of "a

---

1. "Each provision of this title with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." Va.Code § 8.9–202 (Repl.Vol.1991).

2. Virginia does not have a "sign law" which would protect consignors under § 8.9–326(3)(a).

person who would have a perfected security interest in the goods *if they were the property of the debtor.*" Va.Code § 8.9–114. (emphasis added)

■ In resolving this conundrum, this Court has been influenced by the opinion of Chief Judge Krumm of this Court in the case of *In re Shenandoah Warehouse Co.*, 202 B.R. 871 (Bankr.W.D.Va.1996), in which he held that the "commercially reasonable interpretation" of "accounts receivable" in a security agreement included after-acquired receivables although the agreement did not specify such intent. The Court has also been influenced by language appearing in a book of standard UCC forms to create an interest in after-acquired inventory which is remarkably close to the language employed by the bank and the Russells in the document before the Court:

> "[a]ll of Debtor's inventory of appliances located in its showroom at … and its warehouse at …, presently owned or hereinafter acquired…."

5D Bender's Uniform Commercial Code Service Forms and Procedures, Hart, Frederick M. and Willier, William F., § 94.08 at page 9–348, Form 9–9, Clause 13 (Matthew Bender & Co.1998). The Court concludes that the "commercially reasonable" interpretation of the language used in the security agreement includes all furniture actually constituting part of the inventory of the business, however acquired or titled. In short, the Court concludes that in the *absence* of *express* language in the security agreement which would have *excluded* consigned or non-owned furniture from its reach, the Court should give effect to Virginia law adopting the Uniform Commercial Code (UCC) which puts consignors at risk to prior perfected secured parties of their mutual customers. While the issue is a close one considering the language chosen and the actions of the parties, the burden of proof under the statutory scheme must be placed on the consignors who failed to do what was necessary to protect their inter-

ests to establish that the Russells and the bank did not intend for the security agreement to include non-owned or consigned merchandise. When the issue is left in doubt, the statute should be applied as written, even though its result in this case may be harsh and inequitable.

■ The Trustee has also raised the issue that the bank did not advance any funds in reliance upon the inventory provided by the consignors. That is true but irrelevant. Va.Code § 8.9–204(1)(Repl.Vol.1991) states that "a security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral." It being clear that the Bank made a substantial loan to the Russells when it obtained the security interest, its rights were established at that time, even against inventory subsequently acquired and made possible by the funds of others.

### *Conclusion*

■ Because the Court has determined that the bank has not been proven to have engaged in any "leading on" or other affirmative inequitable conduct which caused the consignors not to take the actions required of them under Virginia law to protect their interests, no evidence has been offered to establish that Triangle Discount Furniture was generally known by its creditors to be engaged in selling the goods of others, and the language of the security agreement, which expressly adopted Virginia law, is sufficient to include within its scope consigned goods "as if they were the property" of the Russells, all of the consignors' furniture is subject to the bank's perfected security interest against the Russells' inventory. In the event that the bank's loans are otherwise paid through the liquidation of other collateral it holds, the Trustee would prevail over the rights of all consignors other than Morris Vaughn Furniture Company, the rights of which are superior to the Trustee but inferior to the bank.

This Court shall enter an Order contemporaneously in accordance with this Supplemental Memorandum Opinion.