ARMOR ALL PRODUCTS, Old World Trading Company, Chevron Chemical Company, Turtle Wax, Inc., Borden, Inc., Penzoil Oil Company, First Brands Corp., on behalf of themselves and all other unsecured creditors of American Fuel & Supply Co., Inc., whose claims were allowed in Bankruptcy Case No. 87–01883, Plaintiffs-Appellants-Cross Respondents,†

v.

AMOCO OIL COMPANY, Defendant-Respondent-Cross Appellant.

Court of Appeals

*No. 92–2407. Submitted on briefs July 15, 1993.—Decided August 23, 1994.*

(Also reported in 522 N.W.2d 565.)

†Petition to review granted.

FINE, J., concurs.

For the plaintiffs-appellants-cross-respondents the cause was submitted on the briefs of *Howard, Solochek & Weber, S.C.*, with *C. Scott Pryor* and *Jonathan H. Dudley* of Milwaukee.

For the defendant-respondent-cross-appellant the cause was submitted on the briefs of *Quarles & Brady*, with *W. Stuart Parsons* and *Letha Joseph* of Milwaukee.

Before Sullivan, Fine and Schudson, JJ.

SCHUDSON, J.   Armor All Products (Armor), on behalf of the class of unsecured creditors[1] of American Fuel & Supply Co., Inc. (AFSCO), appeals from a judgment of August 6, 1992, following a court trial, dismissing Armor's complaint with prejudice on the merits. Armor had claimed that under § 402.326, STATS., it had a "common interest" in private label products that Amoco Oil Company (Amoco) warehoused at AFSCO and removed from its warehouses when

---

[1] The plaintiffs in this case are the general unsecured creditors whose claims were allowed in the federal bankruptcy action, *In re American Fuel & Supply, Co., Inc.*, Case No. 87-01883. The trial court certified the plaintiffs to maintain their claims as a class action, pursuant to § 803.08, STATS.

AFSCO declared bankruptcy. Armor sued Amoco for the value of the removed products. The trial court concluded that Armor was not entitled to relief because Amoco's private label goods "were not delivered 'for sale' within the meaning of sec. 402.326(3), Wis. Stats., because they were entrusted to AFSCO for the limited purpose of warehousing and delivery at Amoco's direction."[2] We affirm.

## I. BACKGROUND

This case was tried, in large part, on a stipulated set of facts. Although additional factual findings of the trial court are challenged on appeal and will be discussed, we first summarize the undisputed facts essential to our decision.

Amoco is a Maryland corporation selling petroleum products in Wisconsin. AFSCO was a Wisconsin corporation engaged in the business of selling and distributing petroleum products, bearing familiar brand names such as Valvoline, Penzoil, Quaker State, and Amoco, throughout the midwest and western states. From 1983 through at least June 1987, AFSCO pur-

---

[2] Judge Michael J. Skwierawski decided this issue, which we now review in this appeal. At an earlier stage of the trial court proceedings, in an order dated February 26, 1991, Judge Gary A. Gerlach denied Amoco's pre-trial motion to dismiss the complaint. Amoco had argued that *res judicata* barred Armor's claim. The trial court concluded, however, that Armor could maintain its class action under § 402.326(3), STATS., even though an unrelated action brought by AFSCO against Amoco during the course of the bankruptcy case was settled and dismissed without notice to AFSCO's creditors. Amoco now cross-appeals from Judge Gerlach's order. Because we affirm on the appeal, we need not address the issues on the cross-appeal.

chased and sold Amoco products pursuant to a line of credit Amoco extended to AFSCO.

On December 23, 1986, Amoco and AFSCO entered into an agreement to warehouse Amoco products at AFSCO. Although the agreement referred generally to "the transportation to and warehousing of Amoco's products" at AFSCO warehouses in Wisconsin, Tennessee, and Texas, the trial stipulation provided important details about Amoco's *private label* products that became the focus of the lawsuit:

> 17. Pursuant to the Warehouse Agreement, Amoco: (i) delivered Ford Tractor, Nissan, and Massey-Ferguson private label products to AFSCO; (ii) received orders for the private label products from Ford Tractor, Nissan, and Massey-Ferguson; (iii) directed AFSCO to deliver the private labeled products; (iv) paid AFSCO for its warehousing and delivery services; (v) paid common carriers for delivery of private labeled products beyond AFSCO's delivery territory; and (vi) invoiced and received payment from Ford Tractor, Nissan, and Massey-Ferguson.
>
> 18. AFSCO never sold any of the Ford Tractor, Nissan or Massey-Ferguson private labeled products stored on its premises pursuant to the warehouse agreement.
>
> 19. As between AFSCO and Amoco, AFSCO had no interest in the Ford Tractor, Nissan, or Massey-Ferguson private labeled goods stores by Amoco on AFSCO's premises.
>
> 20. AFSCO did not include the value of Amoco's private label products warehoused on AFSCO's premises pursuant to the warehouse agreement in its inventory records.

For these private label product services, the warehouse agreement provided that AFSCO would be paid

9 cents per gallon for "storage—handling in and out," 16 cents per gallon for "delivery charge," and $3.00 per drum for "charges for accumulating and returning empty drums." The agreement further provided:

    B.    Amoco's product shall not be commingled with any other product. It shall be stored in a segregated area where it is protected from the weather and clearly marked as the property of Amoco.

    C.    Contractor shall not borrow from Amoco's inventory or sell or exchange such product to Contractor's customers or any other person without Amoco's written approval.

On April 23, 1987, AFSCO filed a Chapter 11 bankruptcy petition in bankruptcy court. As a result, Amoco sought to remove the private label products stored with AFSCO, and, on June 1, 1987, the United States Bankruptcy Court for the Eastern District of Wisconsin issued an order allowing Amoco to do so. The order provided, however:

Amoco shall indemnify the DIP [debtor-in-possession] or this bankruptcy estate for damages in the event the court determines that Amoco did not own the product it removed, or in the event the court determines that some person had an interest in the products which were removed, which interest is superior or paramount to interest of Amoco. For indemnification purposes, the products shall be valued at cost at the time of removal.

Thus, Amoco removed its private label products with a value of $362,495.61 from the AFSCO warehouses, and, in 1992, Armor sued to recover their value.

The parties stipulated to proceeding with a bifurcated trial to first resolve the issue of "the extent of Amoco's liability, if any . . . for private label goods removed from the premises" of the AFSCO warehouses, under § 402.326(3), STATS. In addition to the stipulated facts, the trial court considered trial testimony and based its decision on the following factual findings:

- "AFSCO did not commingle Amoco's private label product with any other product";

- "AFSCO did not solicit orders for the . . . private vate label goods stored on its premises pursuant to the warehouse agreement"; and

- "AFSCO did not ship any Amoco private label goods to Amoco's customers without receiving an appropriate order number from Amoco."

On appeal, Armor challenges the trial court finding that AFSCO did not commingle Amoco's private label products with others. Further, regardless of whether the products were commingled, Armor appeals the trial court conclusion that the private label goods "were not delivered 'for sale' " under § 402.326(3), STATS.

## II. DISCUSSION

This case turns on the interpretation and application of § 402.326(3), STATS. In relevant part, it states:

**402.326 Sale on approval and sale or return; consignment sales and rights of creditors.**
**(3)** Where goods are delivered to a person for sale and such person maintains a place of business at which the person deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims

of creditors of the person conducting the business the goods are deemed to be on sale or return. This subsection is applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery:

(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) Establishes that the person conducting the business is generally known by that person's creditors to be substantially engaged in selling the goods of others; or

(c) Complies with the filing provisions of ch. 409.

The trial court determined: "The Amoco private label goods removed from AFSCO's premises in June 1987 were not delivered 'for sale' within the meaning of sec. 402.326(3), Wis. Stats., because they were entrusted to AFSCO for the limited purpose of warehousing and delivery at Amoco's direction." The trial court, therefore, concluded that the protections of § 402.326(3) were inapplicable and dismissed the plaintiff's action.

Whether "goods are delivered . . . for sale" under § 402.326(3), STATS., presents a question of law. *See Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 758-759, 300 N.W.2d 63, 68 (1981) (application of undisputed facts to statute a question of law reviewed *de novo*). In this case, however, Amoco argues, and Armor does not dispute, that the trial court's factual and legal determinations were "intertwined," and thus, although we "need not defer to the trial court's determination of

a question of law,. . . it should be given weight where the legal and factual determinations are intertwined." *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 358, 377 N.W.2d 593, 598 (1985).

Amoco is correct. When, in applying a statute to a set of facts, a trial court's legal conclusion is "intertwined with the factual findings," we "should give weight to the trial court's decision, although the trial court's decision is not controlling." *See Wassenaar v. Panos*, 111 Wis. 2d 518, 525, 331 N.W.2d 357, 361 (1983); *see also Capen Wholesale, Inc. v. Probst*, 180 Wis. 2d 354, 361-362, 509 N.W.2d 120, 123 (Ct. App. 1993) This slightly deferential standard of review was implicit in the supreme court's decision in *Columbia International Corp. v. Kempler*, 46 Wis. 2d 550, 175 N.W.2d 465 (1970), the only Wisconsin authority addressing "for sale" under § 402.326(3), STATS.

Columbia, a corporation engaged in the sale of machinery, owned two machines that were in the possession of Kramer Industries, a manufacturer of machine parts.[3] *Id.*, 46 Wis. 2d at 553-554, 175 N.W.2d at 466. Kramer had limited authority to sell the machines to third-party buyers at the prices set by Columbia, for which Kramer would receive a ten per-

---

[3] Although *Columbia* was an action in replevin decided on summary judgment, the circumstances were similar to those of the instant case. When Kramer entered receivership, the receiver moved to sell his interest in the machines to Kempler and related creditors (d/b/a "Kepco"). "Columbia objected to this proposed sale but subsequently stipulated to withdraw its objection upon Kepco agreeing to retain the machines within the jurisdiction of the court to permit [Columbia] to commence this action." *See Columbia International Corp. v. Kempler*, 46 Wis. 2d 550, 553-555, 175 N.W.2d 465, 466-467 (1970).

cent commission. *Id.* at 558, 175 N.W.2d at 468. On appeal, the creditors challenged the trial court's determination that "the transaction between Columbia and Kramer was a sale and the retention of title in the machines by Columbia, in effect, created a security interest." *Id.* at 557, 175 N.W.2d at 467. The supreme court analyzed whether Columbia had delivered the machines to Kramer "for sale" under § 402.326(3). Concluding that the transaction between Columbia and Kramer was not a sale, *id.* at 557, 175 N.W.2d at 468, the court went on to analyze the nature of the transaction to determine its legal status. Without referring explicitly to any standard of review, the supreme court concluded:

> The critical inquiry must be into the intention of the parties. It has been suggested that the easiest way to determine the intention of the parties is to concentrate on the *function* of the consignment.

*Id.* at 562-563, 175 N.W.2d at 470 (emphasis in original). Thus, the supreme court applied what it termed "the functional test of intention," *id.* at 564, 175 N.W.2d at 471, and in so doing, evaluated the trial court's legal conclusion which was intertwined with its factual assessment of the Columbia—Kramer transaction.

Here, the trial court also made the "critical inquiry" and focused on the "function" of the warehouse agreement by evaluating the contract and other factors. *See id.* The trial court found that function to be "the limited purpose of warehousing and delivery," and included that *finding* within its conclusions of law. Thus, the trial court's legal conclusion that Amoco's private label goods "were not delivered 'for sale' [under

§ 402.326(3)] because they were entrusted to AFSCO for the limited purpose of warehousing and delivery" was "intertwined with the factual findings," and, therefore, we do give weight to the trial court's decision.

Section 402.326(3), STATS., provides protection for unsecured creditors. As the supreme court emphasized:

> People should be able to deal with a debtor upon the assumption that all property in his possession is unencumbered, unless the contrary is indicated by their own knowledge or by public records.

*Columbia*, 46 Wis. 2d at 559, 175 N.W.2d at 469.[4] Thus, under § 402.326(3), STATS., "goods are deemed to be on sale" by creditors if: (1) "goods are delivered to a person for sale"; (2) "such person maintains a place of business at which the person deals in goods of the kind involved"; and (3) such person deals in the goods "under a name other than the name of the person making

---

[4] The rationale for this provision of the UNIFORM COMMERCIAL CODE has been summarized:

> The purpose of this section is to protect the creditors of those who receive goods in the absence of an actual sale on the principle that, lacking objective evidence to the contrary, one may reasonably assume that all goods in the debtor's possession are unencumbered....
>
> . . . .
>
> So long as the owner of goods intentionally or carelessly created an appearance of ownership in another by delivering those goods to, or allowing continued possession by, a person who ordinarily deals in goods of a similar kind, no express actual authority to sell was necessary to create a deemed sale or return.

Deborah Janco Brown, Note, *U.C.C. Section 2-326(3): Creditor Protection in the Deemed Sale or Return Transaction*, 32 CASE W. RES. L. REV. 904, 904-915 (1982).

delivery." By stipulation in this case, the parties agreed that AFSCO satisfied the second and third criteria.

■

Under the statute, the party delivering the goods may protect its interest in those goods from creditors by: (1) complying "with an applicable law providing for a consignor's interest or the like to be evidenced by a sign";[5] (2) establishing "that the person conducting the business is generally known by that person's creditors to be substantially engaged in selling the goods of others";[6] and (3) complying "with the filing provisions of ch. 409 [UNIFORM COMMERCIAL CODE—SECURED TRANSACTIONS]."[7] If, however, Amoco did not deliver its private label goods to AFSCO "for sale," then Amoco did not need to avail itself of any of these potential defenses in order to protect its property from creditors' claims. Thus, we turn to the trial court's determination that the goods were not "delivered for sale."

The parties provide persuasive authorities to support their respective positions, and we begin by acknowledging their close debate on this difficult issue. In Wisconsin, only *Columbia* has approached the question now before us. Although it provides some guidance, *Columbia* does not definitively establish what constitutes delivery for sale. Thus, we find it helpful to review some of its principles along with those that emerge from other authorities. Together, they help explain several factors that often are important to

---

[5] The parties agree that the Wisconsin statutes provide no such applicable law.

[6] The trial court reserved this issue for subsequent proceedings, if needed.

[7] Apparently, Amoco failed to follow the prudent procedure available under chapter 409.

149

a determination of whether "goods are delivered . . . for sale."

## A. Ultimate Sale

Amoco argues that its private label goods were not delivered for sale because AFSCO had no independent authority to sell them. Amoco's argument is premised on its interpretation that "delivered to a person for sale" means "for sale" directly by the party to whom delivery was made. Although Amoco offers some authority to support its position, the prevailing and more persuasive precedents compel a different interpretation.

Amoco primarily relies on *Walter E. Heller & Co. Southeast v. Riviana Foods, Inc.*, 648 F.2d 1059 (5th Cir. 1981). In that case, Riviana entered into a warehouse agreement by which it delivered foods for storage and subsequent delivery to military customers. When Riviana's sales brokers sold the goods, Riviana notified the warehouse to deliver them and paid the warehouse a percentage of the sale price. When the warehouse declared bankruptcy, Riviana removed $23,000 worth of its goods from the warehouse. Heller, a creditor of the warehouse, sued Riviana to enforce its security interest. The Fifth Circuit Court of Appeals affirmed summary judgment for Riviana, concluding that the Florida statute, identical to the one in this case:

> strikes a balance between the desire of the supplier to maintain an interest in his goods and that of the creditor relying on the apparent wealth of his debtor. This balance is drawn in terms of the control exercised by the supplier over the goods in the possession of the debtor. . . . The facts are uncontroverted that [the warehouse company] acted only as warehouseman for [Riviana] and had

no independent authority to sell [Riviana's] merchandise.

*Id.* at 1062.

As Armor hastens to point out, however, a different conclusion came when Heller fought a related legal battle culminating in the Florida Court of Appeals decision in *George-Pacific Corp. v. Walter E. Heller & Co. Southeast, Inc.*, 440 So. 2d 666 (Fla. Dist. Ct. App. 1983). In that case, Heller pursued its security interest in paper goods removed from the same warehouse. As was true in *Riviana*, the owner in *Georgia-Pacific* shipped its products to the warehouse primarily to facilitate their sale to military customers. When the sales took place, the warehouse delivered the goods and *Georgia-Pacific* paid the warehouse a commission representing a percentage of the sale price.

The Florida court acknowledged the *Riviana* decision, pointed out that legal commentators had criticized its "incorrect interpretation," and reached a different conclusion. *See id.* at 669-672. Reviewing several decisions that approached but "did not specifically address the issue of whether [the statute] would apply if the person in possession did not have the authority to personally sell the goods delivered," *see id.* at 670, the court cited *General Electric Co. v. Pettingell Supply Co.*, 199 N.E.2d 326 (Mass. 1964), which quoted the Columbia Law Review article, *Commercial Transactions: U.C.C., Section 2-326 and Creditors' Rights to Consigned Goods*:

> By its terms, the section is applicable only 'if goods are delivered to a person for sale'. But for sale by whom? The court's holding in this case [*General Electric*] covers the situation in which the person receiving the goods is authorized to sell them him-

151

self. The decision, however, does not exclude a broader application of [the statute] to transactions in which goods are delivered for ultimate sale. It is reasonable to assume that a general creditor has protection under the provision whether his debtor had authority to sell all, part or none of the goods. Such an interpretation, consistent with the intent of the framers of the UCC, would protect creditors of unstable consignees who act only as delivery and collection agents.

*Id.* at 670 (quoting 65 COLUM. L. REV. 547, 549-550). Thus, the court concluded that "for sale" reasonably would encompass "ultimate sale" regardless of whether the sale was to be made by the owner or by the party to which the owner delivered the goods. *Id.* at 670-671.

The reasoning of *Georgia-Pacific* is sound. After all, when considering the statutory purpose of protecting creditors, it may make no difference whether the products are for sale directly by the owner or by the party to whom the owner delivered the goods as a step toward ultimate sale. To the creditor, the appearance may be the same.

### B. Control

Although we conclude that "for sale" can encompass ultimate sale, we do not agree with Armor's additional argument that what *Riviana* referred to as the "control exercised by the supplier" is irrelevant to a court's determination of whether the goods were "delivered for sale." In fact, the relative control between the party delivering the goods and the party receiving the goods may guide a court's determination of whether the goods were delivered for sale. The authorities explain that such control may be reflected by a number of factors including contractual arrangements between the

parties; manner of storage, display and sale; and payment.

*1. Contractual Agreement.* In some cases, to determine whether "goods are delivered to a person for sale," the "critical inquiry must be into the intention of the parties." *Columbia*, 46 Wis. 2d at 562, 175 N.W.2d at 470. This may depend, in part, on the contract. In this case, the contract provided that Amoco and AFSCO "arrange for the transportation to and warehousing of Amoco's products at [AFSCO's] warehouses." It also provided that AFSCO "shall make delivery of products to location as directed by Amoco." The warehouse agreement allowed AFSCO no discretion over the price, timing, or method of sale. Thus, by its terms, the warehouse agreement did not provide that Amoco delivered its goods to AFSCO for direct sale by AFSCO, but rather, for ultimate sale by Amoco. Therefore, consistent with the solid reasoning of *Georgia-Pacific*, although the contract provides for warehousing Amoco's products, it also allows them to be for sale as well as storage. Therefore, to make the "critical inquiry" in this case, we must examine more than the contract.[8]

---

[8] Armor cites several cases that clarify that contractual terms do not necessarily establish whether goods are delivered "for sale." For example, in *Escrow Connection v. Haas*, 189 Cal. App. 3d 1640, 1646, (Cal. Ct. App. 1987), the court stated that the "[l]ack of express authority to conclude a sale does not bar a finding that the transaction between the dealer and his supplier was a sale. . . ." That is so. Armor, however, goes too far when it attempts to extend this principle to argue that "[t]he fact that Amoco and even AFSCO may have intended only a warehouse agreement is irrelevant." What the parties intend is relevant

2. *Possession, Storage, Display and Sale.* The manner of storage, display and sale may, in some cases, help determine whether goods are "delivered for sale." In *Columbia*, for example, the supreme court considered that Kramer "had possession of the machines [and] had only limited authority from Columbia to sell to a third-party buyer at the fixed prices set forth on the invoices . . .." *Columbia*, 46 Wis. 2d at 558, 175 N.W.2d at 468. Similarly, here, AFSCO had no independent authority to sell the goods. In fact, it had even less involvement in the sales than Kramer which, by its agreement with Columbia, "was to demonstrate the machines' uses and sell them." *Id.* at 554, 175 N.W.2d at 466.

The manner of display and sale may also have a significant bearing on whether the goods are delivered for sale. To be true to the statute's purpose, a court may have to determine whether creditors reasonably would have considered the business possessing the goods as one that stored products, sold them, or did both. We note that some of the cases Armor cites relate not to warehouses, but to more conventional retail outlets. For example, Armor relies on *In re Monahan & Co., Ltd.*, 29 B.R. 579 (Bktcy. D. Mass. 1983), where the court concluded, "[f]rom a creditor's point of view, the consigned goods appear to be part of the regular inventory of the consignee which, therefore, ought to be subject to their claims." *Id.* at 583. *Monahan*, however, involved the consignment of two rings to a retail jewelry business. Thus, while not necessarily dispositive, in some cases it may prove important to determine whether the goods were delivered to an establishment such as a warehouse, which typically stores goods that

and, in some cases, their intentions may be reflected by factors including the contract.

it does not own, or to a retail establishment. This, from the perspective of a creditor, may indeed relate to a reasonable estimation of "who is the apparent owner of the goods located at the place of business . . .." *Georgia-Pacific*, 440 So. 2d at 669.

Perhaps with such concerns in mind, the trial court evaluated whether Amoco's private label products were commingled with others. The evidence was mixed and subject to interpretation. On the one hand, it established that the private label products were stored on separate pallets in the warehouses. On the other hand, the separation was not obvious, and identifying and locating the private label products depended on reference to computer or manual records. Under the circumstances, such placement may have had an appearance of commingling to some but not to others; an appearance of being for sale, or in storage. Thus, although we accept appellant's argument that whether goods are commingled may, in a given case, be relevant to the question of whether they are "for sale," we reject appellant's argument that the trial court's finding was erroneous. There was stipulated and testimonial evidence to support the trial court's finding that Amoco's private label products were not commingled with others. That, in combination with the fact that the AFSCO facilities were warehouses, further supports the determination that the goods were not delivered for sale.

3. *Payment.* Control also may consist, in part, in the payment arrangement between the party delivering the goods, and the party holding them for ultimate sale. So, for example, in both *Riviana* and *Georgia-Pacific*, the courts were influenced by the fact

that the warehouse was paid a percentage of the sale price. *See Riviana*, 648 F.2d at 1060; *Georgia-Pacific*, 440 So. 2d at 671-672. Similarly, in *Columbia* the court considered that Kramer's receipt of a fixed, ten percent commission was "indicative of a true consignment," not a sale. *See Columbia*, 46 Wis. 2d 557-558, 175 N.W.2d at 468. Such an arrangement may provide a business—including a warehouse that sells goods—incentives to store, display, and assist in marketing products to increase sales. This, in turn, may give the appearance of ownership to potential creditors. Thus, it is noteworthy that in the case before us, Amoco paid AFSCO per gallon for storage, handling, and delivery, regardless of whether products remained in storage, were sold, or were returned to Amoco, and regardless of the sale price.

### C. Apparent Ownership

■ Fundamental to the purpose of § 402.326(3), STATS., is the protection of creditors who may be misled by false appearances of product ownership. Although offered in a somewhat different context, the explanation stated by the Sixth Circuit Court of Appeals makes equally good sense here:

> Indeed, where a firm keeps on its premises goods of the kind that the firm typically sells under a name different from the name of the firm's supplier, a prospective third-party creditor quite logically infers on the basis of appearances that the firm has the power to convey an interest in the goods as security for a loan. Section 2-326 furthers the Uniform Commercial Code goal of efficient commercial transactions by allowing all prospective creditors to safely rely on this logical inference without first

156

undertaking time-consuming and costly searches for secret agreements purporting to deprive the firm of the power to subject such goods to third-party claims.

. . .[T]his provision underscores the Uniform Commercial Code principle that clandestine artifices do not provide third parties with fair and binding notice of a supplier's intent to deprive a firm of the power to subject goods at its place of business to creditors' claims.

*In re Flo-Lizer, Inc.*, 946 F.2d 1237, 1240-1241 (6th Cir. 1991). Where, for whatever reason, the owner delivers goods for storage, display, or eventual sale in a manner that conceals, disguises, or misrepresents the apparent ownership to a creditor, courts should weigh that heavily in the balance. In this context, the "principle of apparent or ostensible ownership," *Columbia*, 46 Wis. 2d at 559, 175 N.W.2d at 469, is the foundation on which creditor protection is built. Here, again, the trial court's finding that the private label goods were not commingled is relevant. AFSCO did not mix and market Amoco's private label goods with others it warehoused. There is no suggestion that Amoco or AFSCO made any attempt to make the goods "appear to be . . . indistinguishable from [AFSCO's] inventory" so that their appearance would "seem likely to mislead" the creditors. *See* 2 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, § 23-5, at 267 (3d ed. 1988).

■■■

These factors are not exhaustive and in individual cases courts may need to consider a variety of circumstances to determine whether goods are "delivered for sale." The complexity of the analysis, however, reflected by the divergent authorities the parties present, certainly punctuates the value of compliance with

§ 402.326(3)(b) or (c), STATS. Had Amoco taken that simple step in this case, the status of its private label goods would have been clear, and the respective rights of the parties certain. This becomes all the more significant when we consider Comment 2 to U.C.C. section 326(3), that recommends resolving "all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." *See* WIS. STATS. ANN., § 402.326, at 238. In light of the underlying purposes of the statute, we agree that such resolution of a close case has merit.

In this case, however, the stipulated facts, in combination with the trial court's additional factual findings, do support the trial court conclusion that Amoco's private label products "were entrusted to AFSCO for the limited purpose of warehousing and delivery at Amoco's direction." Thus, although ultimate sales were anticipated, we conclude that Amoco did not deliver the private label products to AFSCO "for sale" under § 402.326(3), STATS. Accordingly, the trial court judgment is affirmed.

*By the Court.*—Judgment affirmed.

FINE, J. (*concurring*). Section 402.326(3), STATS., provides:

> Where goods are delivered to a person for sale and such person maintains a place of business at which the person deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. This subsection is applicable even though an agreement purports to reserve title to the person making deliv-

ery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery:

(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) Establishes that the person conducting the business is generally known by that person's creditors to be substantially engaged in selling the goods of others; or

(c) Complies with the filing provisions of ch. 409.

Under its contract with Amoco Oil Company, American Fuel and Supply Co., Inc., was to store Amoco's product, and, on Amoco's order, deliver those products to Amoco's customers. American Fuel had no authority to sell Amoco's product. Accordingly, Amoco's goods were not delivered to American Fuel "for sale," and § 402.326(3), STATS., is not applicable. Insofar as the majority opinion recognizes this, I concur. I cannot, however, join in the majority's holding that ultimate sale by the entity owning the goods (here, Amoco) can also trigger application of § 402.326(3), even though the goods are delivered to the warehouse for storage only, and that resolution of whether § 402.326(3) applies under that circumstance must be made on a case-by-case determination. The authorities upon which the majority rests this holding concern consignment. This is not a consignment case. Nevertheless, the majority focuses on the appearance to creditors—a proper consideration in consignment cases but not here. Insofar as a creditor is concerned, there is no difference in appearance between the storage of goods held by the warehouse for ultimate sale by the owner of those goods, and the storage of goods sent to the ware-

house by someone with no intent to ever sell, a collector (of antiques or art) for example. Clearly, § 402.326(3) would not apply in the latter situation even under the majority's rationale; given the statute's language, there is no reason that it should apply in the former situation either. Significantly, the majority does not cite any cases that hold that a storage arrangement as we have here permits application of § 402.326(3) merely because the owner will, one day, sell the stored goods.

The Uniform Commercial Code was designed to "simply, clarify, and modernize" the law—not complicate and obfuscate it. Section 401.102(2)(a), STATS. Unfortunately, the majority's discussion of "ultimate sale" has done just that. The fuzziness of the case-by-case analysis championed by the majority not only flies in the face of the clear "delivered . . . for sale" language of the statute, but, as a result, destroys the certainty that is so essential to the predictability of commercial transactions.[1]

---

[1] On page 158 of the Majority Opinion, the majority writes that the Official Uniform Commercial Code comment "recommends resolving 'all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer.' " It does no such thing. The pertinent part of the Comment reads in full with the language omitted by the majority in italics: " *Pursuant to the general policies of this Act which require good faith not only between the parties to the sales contract, but as against interested third parties, subsection (3) resolves* all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." WIS. STATS. ANN., § 402.326 at 238 (emphasis added). The Comment clearly notes that the resolution of doubts in favor of general creditors has been done by the statute; it does not recommend an additional level of doubt-resolution by the courts. Further, the Comment's clear reference to "buyer" underscores that deliveries to a warehouse for

storage were not meant to be encompassed within the scope of § 402.326(3).