ARMOR ALL PRODUCTS, Old World Trading Company, Chevron Chemical Company, Turtle Wax, Inc., Borden, Inc., Penzoil Oil Company, First Brands Corporation, on behalf of themselves and all other unsecured creditors of American Fuel and Supply Company, Inc., whose claims were allowed in Bankruptcy Case No. 87–01883, Plaintiffs-Appellants-Cross Respondents-Petitioners,

v.

AMOCO OIL COMPANY, Defendant-Respondent-Cross Appellant.

Supreme Court

*No. 92–2407. Oral argument May 24, 1995.—Decided June 20, 1995.*

(Also reported in 533 N.W.2d 720.)

35

For the plaintiffs-appellants-cross respondents-petitioners there were briefs by *C. Scott Pryor, Jonathan H. Dudley* and *Howard, Solochek & Weber, S.C.,* Milwaukee and oral argument by *C. Scott Pryor.*

For the defendant-respondent-cross-appellant there was a brief by *W. Stuart Parsons, Andrew M. Barnes, Letha Joseph* and *Quarles and Brady,* Milwaukee and oral argument by *W. Stuart Parsons.*

DAY, J. This a review of a decision of the court of appeals[1] affirming an order of the circuit court for Milwaukee County, Honorable Michael J. Skwierawski, Judge, that dismissed with prejudice and on the merits the claims raised by seven unsecured trade creditors (Armor) of American Fuel & Supply Co., Inc. (AFSCO) in a class action suit. The creditors were the members of AFSCO's Official Committee of Unsecured Creditors. 11 U.S.C. sec. 1102. The class action sought to recover, pursuant to sec. 402.326(2), (3), Stats. (1993–94),[2] the value of certain private labeled goods[3] owned by Amoco Oil Company (Amoco) which were in the possession of AFSCO at the time AFSCO filed for protection from creditors under Chapter 11 of the United States Bankruptcy Code. Armor claimed that under sec. 402.326(3), Stats., the private label goods should be deemed to be on sale or return[4] because they were delivered "for sale." Goods deemed to be on sale or

---

[1] Armor All Products v. Amoco Oil Co., 187 Wis. 2d 136, 522 N.W.2d 565 (Ct. App. 1994).

[2] These sections are identical to §§ 2–326(2) and (3) of the Uniform Commercial Code.

[3] Private labeled goods are goods produced by one company for another company which bear the label of the latter company. In this case, Amoco produced various types of oil for Ford Tractor, Nissan and Massey-Ferguson and packaged the oils in containers bearing the labels of those companies. AFSCO also had goods bearing Amoco labels, but those goods are not part of this lawsuit.

[4] Goods on "sale or return" are defined in sec. 402.326(1)(b), Stats. as follows:

> **402.326 Sale on approval and sale or return; consignment sales and rights of creditors. (1)** Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is: . . . (b) A 'sale or return' if the goods are delivered primarily for resale.

40

return are subject to the claims of creditors under sec. 402.326(2), Stats.[5] We conclude that Armor did not have a cause of action under sec. 402.326(2), Stats., because the private-labeled goods in the possession of AFSCO were not delivered "for sale" as that term is used in sec. 402.326(3), Stats. Therefore, we affirm the decision of the court of appeals.

Amoco is a Maryland corporation selling petroleum products in Wisconsin. AFSCO was a Wisconsin corporation engaged in the business of wholesale sales and distribution of petroleum products throughout the midwest and western states.

In 1986, Amoco entered into an agreement with AFSCO, the "contractor," for warehousing and delivery of its private labeled goods which provided in relevant part:

> AMOCO DESIRES TO ARRANGE FOR THE TRANSPORTATION TO AND WAREHOUSING OF AMOCO'S PRODUCTS AT CONTRACTOR'S WAREHOUSES LOCATED AT:
>
> 1. 9053 N. DEERBROOK TRAIL MILWAUKEE, WISCONSIN 53223–0768
> 2. 3365 ASTEROID DRIVE MEMPHIS, TENNESSEE 38109
> 3. 1125 HAYDEN ROAD CARROLLTON, TEXAS 75006–5743
>
> . . . .
>
> I. *Transportation. . . .*

---

[5] Section 402.326(2), Stats. (1993–94), provides:

**402.326 Sale on approval and sale or return; consignment sales and rights of creditors. . . . (2)** Except as provided in sub. (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

B.   Contractor shall prepare necessary documentation to cover reshipment of product to locations as directed by Amoco, and forward such documentation to the appropriate Amoco facility for proper customer invoicing.

. . . .

II.   *Storage of Product. . . .*

B.   Amoco's product shall not be commingled with any other product. It shall be stored in a segregated area where it is protected from the weather and clearly marked as the property of Amoco.

C.   .Contractor shall not borrow from Amoco's inventory or sell or exchange such product to Contractor's customers or any other person without Amoco's written approval.

. . . .

V.   *Redelivery of Product to Amoco Accounts*

A.   Contractor shall redeliver Amoco's products from the warehouses at Amoco's direction to the areas as shown on the attached map. Deliveries made within the areas shown on the attached map will be made by Contractor's trucks.

B.   Amoco may request Contractor to deliver product outside of Contractor's geographic area from time to time with carriers designated by Amoco.

VI. *Payment of Service*

A. Payment by Amoco for warehousing services rendered will be as follows:

| | |
|---|---|
| Storage—handling in and out. | $0.09/gallon |
| Delivery charge within geo- graphic area, includes barrel pump off when necessary. | $0.16/gallon |
| Delivery charges outside of geographic area will be invoiced direct to Amoco by carriers. | |
| Contractor's fees for arrang- ing for shipments outside of geographic area are included in storage and handling charges stated above. | |
| Charges for accumulating and returning empty drums. | $3.00/drum |

VII. *Responsibility for Product Security and Public Liability*

. . . .

B. Contractor shall cause no liens or encumbrances to be placed on Amoco's product including any liens of Contractor.

. . . .

X. *Title to Product*

43

A. Title to product delivered by Amoco to Contractor shall at all times remain the product of Amoco until reshipment by Contractor as directed by Amoco.

B. Contractor agrees to execute a Uniform Commercial Code Form No. 1 attesting to the ownership of such products by Amoco as well as a recordable Notice of Agreement.

Pursuant to the agreement, Amoco delivered private labeled goods to AFSCO's warehouses. Amoco received orders for its private label goods from Ford Tractor, Nissan and Massey Ferguson dealers. Amoco then directed AFSCO to deliver the private label goods. Amoco paid AFSCO for its warehousing and delivery services. Amoco paid common carriers for delivery of private label goods beyond AFSCO's delivery territory. Amoco invoiced and received payment from Ford Tractor, Nissan and Massey Ferguson.

In April 1987, AFSCO filed for protection from creditors under Chapter 11 of the United States Bankruptcy Code. At that time, AFSCO had possession of over $360,000 of Amoco's private label products. On June 1, 1987, the Bankruptcy Court granted Amoco permission to remove its private label products, but required:

Amoco shall indemnify the DIP [debtor-in-possession] or this bankruptcy estate for damages in the event the court determines that . . . some person had an interest in the products which were removed, which interest is superior or paramount to interest of Amoco. . . .

Amoco subsequently removed its private label products. On August 15, 1988, the Bankruptcy Court

confirmed AFSCO's Second Amended Plan of Reorganization which allowed the claims of the unsecured creditors. *In re American Fuel & Supply Co., Inc.,* Case No. 87–01883 (Bkrtcy E.D. Wis. 1991).

On October 2, 1990, Armor commenced this action. Amoco moved for summary judgment on August 29, 1991 arguing that sec. 402.326(3), Stats., did not apply and that Armor's claims were barred by confirmation of AFSCO's plan of reorganization by the bankruptcy court. The parties stipulated and the circuit court ordered that the trial be bifurcated so that the first phase would deal only with the question of Amoco's liability under sec. 402.326(3), Stats.[6]

The case was tried on February 21, 1992. The trial was based largely on stipulated facts. The trial stipulation provided in relevant part:

11. From 1983 through at least June of 1987, AFSCO purchased and sold "Amoco" labeled products pursuant to a line of credit Amoco extended to AFSCO....

12. Products sold by AFSCO included hydraulic oil, transmission fluid, transmission oil and gear and axle oil which came in 55, 30, 5, 2½, and 2 gallon containers bearing the labels of Sovereign Oil, Champion Oil, Valvoline, Pennzoil, Quaker State, Mobil, and Exxon.

. . .

---

[6] In an order dated February 26, 1991, Judge Gary A. Gerlach denied Amoco's pre-trial motion to dismiss the complaint because of confirmation of the plan of reorganization. Amoco cross-appealed this order to the court of appeals, which did not address it. *Armor,* 187 Wis. 2d at 141 n.2. Because we affirm, we need not remand for consideration of Amoco's cross-appeal.

14. Notwithstanding section X. B. of the Warehouse Agreement, Amoco never filed a Uniform Commercial Code Form No. 1 Financing Statement regarding Amoco's ownership of any of its products.

. . .

16. Amoco's products which were warehoused at AFSCO included hydraulic oil, transmission fluid, transmission oil, and gear and axle oil which came in 55, 30, 5, 2½ and 2 gallon containers bearing the labels of Massey-Ferguson, Ford Tractor and Nissan.

17. Pursuant to the Warehouse Agreement, Amoco: (i) delivered Ford Tractor, Nissan, and Massey-Ferguson private label products to AFSCO; (ii) received orders for the private label products from Ford Tractor, Nissan, and Massey-Ferguson; (iii) directed AFSCO to deliver the private labeled products; (iv) paid AFSCO for its warehousing and delivery services; (v) paid common carriers for delivery of private labeled products beyond AFSCO's delivery territory; and (vi) invoiced and received payment from Ford Tractor, Nissan, and Massey-Ferguson.

18. AFSCO never sold any of the Ford Tractor, Nissan or Massey-Ferguson private labeled products stored on its premises pursuant to the warehouse agreement.

19. As between AFSCO and Amoco, AFSCO had no interest in the Ford Tractor, Nissan, or Massey-Ferguson private labeled goods stores [sic] by Amoco on AFSCO's premises.

20. AFSCO did not include the value of Amoco's private label products warehoused on AFSCO's premises pursuant to the warehouse agreement in its inventory records.

One witness testified, Mr. Stuart Banks, who was either AFSCO's Director of Purchasing or General Manager at all times relevant to this suit. Mr. Banks' testimony largely related to the method of operation at the warehouses, including the way items were stored, inventoried, and shipped, and the course of performance between AFSCO and Amoco.

The circuit court rendered its Findings of Fact and Conclusions of Law and Order for Judgment on August 6, 1992. In addition to adopting as fact paragraphs one to twenty-six of the trial stipulation, the circuit court found that AFSCO did not commingle Amoco's private label product with any other product and that AFSCO did not solicit orders for the private label goods. Based on these facts, the circuit court held that:

> The Amoco private label goods removed from AFSCO's premises in June 1987 were not delivered 'for sale' within the meaning of sec. 402.326(3), Wis. Stats., because they were entrusted to AFSCO for the limited purpose of warehousing and delivery at Amoco's direction.

Therefore, the circuit court dismissed Armor's complaint.

The court of appeals affirmed. Judge Charles B. Schudson, writing for the court, held that "the relative control between the party delivering the goods and the party receiving the goods may guide a court's determination of whether the goods were delivered for sale." *Armor All Products,* 187 Wis. 2d at 152. Finding that AFSCO did not possess a sufficient level of control over the goods, the court of appeals concluded that the private label goods were not delivered "for sale." Judge Ralph Adam Fine concurred. Armor filed a petition for review, which was granted December 14, 1994.

This case requires this court to determine whether Amoco delivered goods to AFSCO "for sale" as that term is used in sec. 402.326(3), Stats. Whether goods are delivered "for sale" is a question of law. *See Kania v. Airborne Freight Corp.,* 99 Wis. 2d 746, 758–59, 300 N.W.2d 63 (1981) (application of undisputed facts to statute a question of law reviewed *de novo).* However, here the circuit court's legal determination that the goods were not delivered "for sale" was "intertwined with the factual findings" relating to warehouse practices and the course of performance between AFSCO and Amoco. *See Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983). In deciding cases in which legal and factual determinations are intertwined, although we "need not defer to the trial court's determination . . . it should be given weight." *Koenings v. Joseph Schlitz Brewing Co.,* 126 Wis. 2d 349, 358, 377 N.W.2d 593 (1985).

Section 402.326(3), Stats., provides:

**402.326 Sale on approval and sale or return; consignment sales and rights of creditors. . . .** (3) Where goods are delivered to a person *for sale* and such person maintains a place of business at which the person deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. This subsection is applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making the delivery:

(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) Establishes that the person conducting the business is generally known by that person's creditors to be substantially engaged in the selling the goods of others; or

(c) Complies with the filing provisions of ch. 409.

Section 402.326(3), Stats. (emphasis added).

It is undisputed that AFSCO maintained a place of business at which it dealt in goods of the kind involved, and did so under a name (AFSCO) other than the name of the person making delivery (Amoco). It is also undisputed that Amoco did not protect itself from claims by complying with sec. 402.326(3)(a) or (c), Stats. Thus, if the private label goods were delivered "for sale," they will be deemed to be on sale or return unless Amoco can prove that subsection (b) of sec. 402.326(3) applies.[7] If the goods are deemed to be on sale or return, they will be subject to the claims of AFSCO's creditors. Section 402.326(2), Stats.

■

We conclude that the goods were not delivered "for sale" because the agreement between Amoco and AFSCO was a pure warehousing and delivery agreement, and was not any type of consignment agreement which made AFSCO a sales agent for Amoco's private label products.

---

[7] Section 402.326(3)(b), Stats., is an affirmative defense based on the knowledge of the creditors. Amoco did not have the opportunity to present evidence on the creditors' knowledge. Because we conclude that the private label goods were not delivered "for sale," we need not remand the case to the circuit court on this point.

Interpretation of a statute begins with the language of the statute itself. *Weiss v. Regent Properties, Ltd.,* 118 Wis. 2d 225, 229, 346 N.W.2d 766 (1984). Here, the statute states that it applies if "goods are delivered to a person for sale." Section 402.326(3), Stats. Armor argues that this language is unambiguous and makes the statute applicable whenever the delivered goods will ultimately be sold by some person. We do not agree that the statute is unambiguous. "A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in either two or more senses." *State v. Speer,* 176 Wis. 2d 1101, 1121, 501 N.W.2d 429 (1993). An equally reasonable interpretation of the statute is that it unambiguously applies only when the goods are delivered for the purpose of sale by the person to whom they are delivered.

Since the language of the statute is ambiguous, this court may consider legislative intent and collateral sources including "the scope, history, context, subject matter and object of the statute." *Id.* The scope and history of the statute, and the reflection of those factors in the official comments which accompany the statute demonstrate that it was not intended to apply to those bailments that are merely a temporary entrustments of possession of goods. Instead, it was intended to apply only to bailments when the delivery may, in one way or another, be properly classified as a consignment.

The term consignment sale is a misnomer since "the efficacy of the device depends on a finding that no sale has been made." William D. Hawkland, *Consignment Selling Under the Uniform Commercial Code,* 67 Com. L.J. 146, 147 (1962). In reality, a consignment sale refers to one of two particular types of bailments.

Yet, the misnomer persists "precisely because merchants know that consignments are sales." *Id.*

Consignment sales come in two forms: true or price-fixing and false or security. *Columbia International Corp. v. Kempler,* 46 Wis. 2d 550, 559, 175 N.W.2d 465 (1970). A true consignment creates a simple sales agency in which goods are delivered to a dealer for resale purposes. This device is used as a price-fixing arrangement whereby the consignor insists that the consignee charge a certain price for goods. *Id.* at 559–60. "A security consignment involves the delivery of goods to a merchant who has been induced to accept them by an agreement from the consignor permitting their return in lieu of payment if they are not resold." *Id.* at 559. In order to provide security to the consignor, the consignor maintains title to the goods. *Id.*

Both types of consignments create problems of apparent or ostensible ownership. *Id.* However, prior to the Code, courts protected creditors only in cases of security consignments where the "dealer is permitted to act like something more than a mere agent." William D. Hawkland, *Consignments Under the Uniform Commercial Code: Sales or Security?,* Uniform Commercial Code Coordinator 395, 396–97 (1963). Courts distinguished the two types of consignments based on the intent of the parties. *Columbia,* 46 Wis. 2d at 562–63. But, this was a very difficult task which led to unpredictable and unfair results to both consignors and creditors of the dealer. *See* Hawkland, *Consignment Selling, supra,* at 147. In order to eliminate the need to make this determination and to protect both the consignors and the creditors of the dealer, the drafters of Article II wanted to make it clear that all consignment

51

sales would be subject to claims from the consignee's creditors unless one of the enumerated steps were taken by the consignor.

But, consignments were still distinguished from "mere custodial-agent relationship[s]." *See Columbia,* 46 Wis. 2d at 558. UCC § 2–326 was not intended to reach these types of transactions. This intent is evident in the following comment:

> Pursuant to the general policies of this Act which require good faith not only between the parties to the *sales contract,* but as against interested third parties, subsection (3) resolves all reasonable doubts as to the nature of the transaction in favor of the general creditors of *the buyer.* As against such creditors words such as *"on consignment"* or *"on memorandum,"* with or without words of reservation of title in the seller, are disregarded when buyer has a place of business at which he deals in goods of the kind involved . . . .

Official UCC Comment 2 on § 2–326 (emphasis added).

The comments of the Wisconsin Legislative Counsel also focus on the fact that goods must have. been consigned to fall within the statute:

> New provision, but sec. 241.26, Stats., has the same basic purpose and reaches the same result, i.e., the protection of persons dealing with one to whom the owner has *consigned goods for the purpose of sale.* This section covers only that part of sec. 241.26, Stats., which relates to protection of the *consignee's* creditors.

1961 Report of the Wisconsin Legislative Council, Volume III, Part II § 2–326 at 97 (emphasis added).

Thus, the legislative intent as derived from the scope and history of the statute demonstrate that the

statute was intended to reach only transactions that were in some way consignments. Quite simply, "[a] true bailment . . . of goods is not a sale nor a consignment sale and thus UCC § 2–326 should not apply." Ronald A. Anderson, 3A *Anderson on the Uniform Commercial Code* § 2–326:42 (3d ed. 1995).

We find further support for our conclusion in other courts' interpretations of their state law equivalents of UCC § 326(3). Where a consignment situation exists, courts have correctly held that UCC § 2–326(3) applies.[8] These cases simply comport with the comment to the code cited above. Where a consignment arguably exists, UCC § 2–326(3) resolves all doubts in favor of the creditor.

However, where no consignment exists, courts have routinely held that UCC § 2–326 is inapplicable. For example, in *In re Key Book Service, Inc.,* 103 B.R.

---

[8] *See Manger v. Davis,* 619 P.2d 687 (Utah 1980) (delivery of diamond ring to jeweler was a true consignment subject to the Utah equivalent to UCC § 2–326); *General Electric Co. v. Pettingell Supply Co.,* 199 N.E.2d 326 (Mass. 1964) (where agreement stated the goods were to be "maintain[ed] on consignment," and the consignee sold over one-fourth of the goods without any involvement by the consignor, Massachusetts equivalent of UCC § 2–326 applied); *In re Monahan & Co., Ltd.,* 29 B.R. 579 (Bkrtcy. Mass. 1983) (delivery of two rings to jeweler was a consignment where jeweler acted as sales agent for bailor); *Vonins, Inc. v. Raff,* 243 A.2d 836 (N.J. Super. A.D. 1968) (fact that agreement between warehouser/installer and general contractor/ supplier for installation of equipment used the term "subcontractor" instead of "sales" not dispositive where warehouser/installer received compensation equal to 40% of contract price general contractor charged for installation of equipment); *In re Novak,* 7 UCC Rptr. 196, 202 (Md. Cir. Ct. 1969).

39 (Bkrtcy. D. Conn. 1989), Kampmann, a publisher's sales representative and distributor for general publishers, entered into a contract with the debtor, a book wholesaler. Pursuant to that agreement, the debtor was entrusted with books for the limited purpose of performing warehousing facilities until the books were sold by Kampmann. *Id.* at 43. The court held that the books were not delivered "for sale" under Connecticut's version of Section 402.326(3), Stats. *Id.; see also Walter E. Heller & Co., S.E. v. Riviana Foods, Inc.,* 648 F.2d 1059 (5th Cir. 1981) (Florida's counterpart to Section 402.326(3), Stats., did not apply to a warehousing arrangement where debtor lacked authority to sell goods because debtor did not have sufficient control over the goods); *In re Zwagerman,* 125 B.R. 486, 492 (W.D. Mich. 1991) ("It is not clear whether 'for sale' refers to the sale to the buyer or resale by the buyer. . . . But delivery was not 'for sale' in either event. . . . [T]he delivery was for the care, feeding and fattening the cattle."); *In re Medomak Canning Co.,* 25 U.C.C. Rep. Serv. 437 (Bkrtcy. D. Me. 1977), *aff'd without opinion,* 588 F.2d 818 (1st Cir. 1978) (transaction not deemed a sale or return where parties contemplated merely that the holder of goods would process the goods entrusted to it for later sale by the owner). "Thus, we join those courts which have held that temporary entrustments of possession by a bailee, without more, are not 'sales on consignment' within the meaning of U.C.C. § 2–326." *Evergreen v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 97–98 (1st Cir. 1993).

Armor cites *Georgia-Pacific Corp. v. Walter E. Heller & Co.,* 440 So 2d 666 (Fla. App. 1st Dist. 1983), in support of its contention that a consignment need not exist for UCC § 2–326(3) to apply. However, in that case the contract between the parties repeatedly

referred to "consigned merchandise." *Id.* at 667. The court noted that at least one other court had held that the term "consigned" would be deemed to have the meaning associated with a general commercial transaction, thus making the transaction fall within UCC § 2–326. *Id.* at 671 (citing *In re Novak,* 7 UCC Rptr. at 202).

Moreover, a close analysis leads one to conclude that the facts of that case did create a consignment situation. As was stated in *Evergreen,* a bailment *without more* does not create a consignment. *Evergreen,* 4 F.3d 90, 97–98. In *Georgia-Pacific,* the debtor received his compensation from the bailor in the form of a sales commission of eight percent. Further, the party storing the goods had the authority to deliver goods without first obtaining permission to do so from the owner of the goods. *Id.* at 668. Thus, the debtor became a sales agent for the bailor, with an incentive to arrange sales of the goods and who partially bore the risk of price fluctuations. Under these circumstances, the Florida Appellate Court found that "[t]he consignment of paper goods by Defendant to [debtor] was to facilitate sales transactions and was thus 'for sale' within the meaning of [Florida's equivalent of UCC § 2–326]." *Georgia-Pacific,* 440 So 2d at 672.

Three other cases cited by Armor also involve a bailee who was given an incentive to arrange the sale of the bailor's product. *Escrow Connection v. Haas,* 235 Cal. Rptr. 200 (Cal. App. 4 Dist. 1987) (commercial dealer in automobiles to receive a commission on the sales price of a car owned by another commercial dealer); *In re Novak,* 7 UCC Rptr. at 202 (debtor described as a "sales agent" and received commissions on sales); *Vonins,* 243 A.2d at 836 (warehouser/installer received forty percent of the total

contract price earned by a general contractor/ supplier for installation of equipment). In all these cases the bailee became a sales agent for the bailor.

Thus, we agree with the court of appeal's statement in this case that "the relative control between the party delivering the goods and the party receiving the goods may guide a court's determination of whether the goods were delivered for sale." *Armor All Products,* 187 Wis. 2d at 152. However, we disagree with the court of appeals' conclusion that *Columbia* set up an "intent of the parties" type analysis for whether the transaction is a delivery to a person "for sale." *Id.* at 147. The *Columbia* court stated that this was the test to determine whether the consignment was a true or false consignment, which it needed to determine in order to decide whether Article IX applied to the transaction in that case. *Columbia,* 46 Wis. 2d at 562–63.

We conclude that the subjective intent of the parties does not control. Instead, the test for whether sec. 402.326(3), Stats., applies is whether an objective analysis of the transaction documents, the course of performance between the parties and the actions taken by the bailee could lead a reasonable creditor to conclude that a consignment existed. However, "all reasonable doubts" as to whether the transaction was a consignment will be resolved in favor of the general creditors of the consignee. Official UCC Comment 2 on § 2–326.

Here, the only relationship between the bailor and bailee was for warehousing and delivery of the goods. There is no reasonable doubt that the transaction was not a consignment. The payment schedule is entirely

consistent with traditional warehouse agreements, and AFSCO's compensation was not tied in any way to the variations in the price Amoco charged for the goods. Similarly, while it is true that AFSCO's compensation increased if Amoco was able to sell more product, it did so only because it was required to move more product in and out of its warehouse. Further, AFSCO had no control over the sales. AFSCO was not, in any way, a sales agent of Amoco. Thus, an objective analysis of the warehousing and delivery bailment agreement would not lead a reasonable creditor of AFSCO to the conclusion that the contract was a consignment.

Armor places great emphasis on *In re Flo-Lizer, Inc.,* 946 F.2d 1237 (6th Cir. 1991). In that case, Ciba-Geigy, a manufacturer of agricultural herbicides, delivered herbicide to Flo-Lizer via a distributor named Kova, Inc. Ciba-Geigy asserted that the purpose of the delivery was not for sale, but for warehousing. The *Flo-Lizer* court stated that "[t]he facts do not bear this out." *Id.* at 1239. It noted that Ciba-Geigy employed sales persons that encouraged Flo-Lizer to receive goods, exactly opposite of what one would expect if the relationship were purely for warehousing. Further, the amount delivered was not determined by Ciba-Geigy. Instead, Flo-Lizer calculated how much it could sell and Ciba-Geigy shipped that amount. Finally, the court found that the "warehousing" fee paid to Flo-Lizer "amounted to no more than a sales incentive." *Id.* The court held that "under the facts as stipulated and as found by the bankruptcy court after trial, section 2–326 applies directly." *Id.* at 1241.

Armor reads the decision in *Flo-Lizer* more broadly to hold that any traditional bailment contract will be deemed a sale or return if the bailee deals in goods of the kind unless the bailor complies with the notice

provisions of UCC § 2–326. *See Flo-Lizer,* 946 F.2d at 1240–41. A few courts and commentators have reached this conclusion. *See e.g. Georgia-Pacific,* 440 So 2d at 669; *Commercial Transactions: UCC Section 2–326 and Creditor's Rights to Consigned Goods,* 65 Colum. L. Rev. 547 (1965). Those courts that have reached this conclusion have generally relied on the rationale stated in the following passage from the Columbia Law Review which interpreted *Pettingell,*[9] the first published case to interpret UCC § 2–326:

> [I]f Pettingell's sole authority had been to distribute the lamps to subagents, a difficult problem would have arisen. By its terms, the section is applicable only if "goods are delivered to a person for sale." But for sale by whom? The court's holding in this case covers the situation in which the person receiving the goods is authorized to sell them himself. The decision however, does not exclude a broader application of Section 2–326(3) to transactions in which goods are delivered for ultimate sale. It is reasonable to assume that a general creditor has protection under the provision whether his debtor had authority to sell all, part, or none of the goods. Such an interpretation, consistent with the intent of the framers of the UCC, would protect creditors of unstable consignees who act only as delivery and collection agents. . . .

*Commercial Transactions, supra* at 549–50 (footnotes omitted).

---

[9] In *Pettingell,* the court held UCC § 2–326 applicable, but expressly stated that it was not deciding whether the result would be the same if the debtor had not had authority to sell the goods in his possession. *Pettingell,* 199 N.E.2d at 329 ("We need not determine the ruling required if Pettingell's sole authority had been to distribute lamps to subagents.").

However, we do not find these sources persuasive. As demonstrated above, the statute was created to deal with consignments. Therefore, at least one set of commentators has stated that decisions that do not involve consignments are "stretching UCC § 2–326, so as to encompass not-for-sale bailments." David Frisch & John D. Wladis, *Survey: Uniform Commercial Code General Provisions, Sales, Bulk Transfers, and Documents of Title,* 43 Bus. Law. 1259, 1279 (1988). At the heart of decisions that apply UCC § 2–326 to not-for-sale bailments is the fear that the effect of divorcing ownership from possession will somehow mislead those who come into contact with the possessor. However persuasive this rationale may be in consignment situations,[10] it is not enough to justify extending sec. 402.326(3), Stats., to this transaction. "[A]s recent scholarship suggests, such concern is based on too many untested assumptions and ignores too many competing policies to warrant the position of influence it now holds." Frisch & Wladis, *supra,* at 1279. This conclusion is especially true given the practices of modern commercial lenders. "At one time creditors may have relied on their debtor's stock in trade, but modern commercial lenders, beginning with the advent of open-account selling and inventory financing, stopped

---

[10] In consignment situations, this rationale serves as an anti-fraud rule which penalizes consignors who secretly consign goods. Secret consignments may be created either as a true consignment or to disguise inventory lending. The commercial law should protect the true consignor. However, both are subject to the same optional filing rules because placing an extra filing burden on true consignors obviates the need to distinguish between the two situations. *See* John Dolan, *The UCC's Consignment Rule Needs an Exception for Consumers,* 44 Ohio St. L.J. 21, 34–35 (1983).

extending credit based on a debtor's ostensible ownership of merchandise. Today creditors either investigate that appearance or do not rely on it at all." John Dolan, *The UCC's Consignment Rule Needs an Exception for Consumers,* 44 Ohio St. L.J. 21, 29 (1983). Further, an investigation into the ownership of the inventory in the possession of AFSCO would have revealed that AFSCO did not own the Amoco private label goods, since the warehousing agreement provided that the private label goods not be shown as AFSCO inventory, and they in fact were not shown as inventory.

Finally, Armor argues that it should prevail because the statute gave Amoco an easy means of protecting its interests which it did not use. Section 402.326(3)(c), Stats, provides an exception to the rule that goods will be deemed to be on sale or return if the person delivering goods files an appropriate financing statement. The existence of this exception is irrelevant because the rule itself never applied to Amoco. Since the rule did not apply to Amoco, it did not need to rely on an exception to that rule, or for that matter do anything, to protect its ownership interest in the private label goods from the claims of the bailee's creditors.[11]

In conclusion, we hold that sec. 402.326(3), Stats., does not apply to the private label goods delivered to AFSCO by Amoco. Therefore, Armor has no claim to those goods, and the decision of the court of appeals is affirmed.

---

[11] Although we conclude that Amoco did not need to file to protect its interest in the private label goods, it would have been much easier for all involved if it had taken this very simple step.

*By the Court*—The decision of the court of appeals is affirmed.